[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 10, 2008
THOMAS K. KAHN
CLERK

No. 07-11061

D. C. Docket No. 05-00063 CV-5

JOHN BURNETTE,
Father of the Decedent John Robert Burnette,

Plaintiff-Appellee,

versus

MILTON SHANE TAYLOR,
DAVID A. BATTON,
ROBERT EUGENE WATERS,
MICHAEL A. JOHNSTON,
Individually and in their capacity as
Bacon County Sheriff's Deputies,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(July 10, 2008)**

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and MARTINEZ,[*]
District Judge.

_____

[*]Honorable Jose E. Martinez, United States Circuit Judge for the Southern District of Florida,
sitting by designation.

EDMONDSON, Circuit Judge:

Plaintiff filed this action on behalf of his deceased son, John Robert "Buster" Burnette, who died of a drug overdose while in police custody. Plaintiff alleges that Buster died as a result of Defendants' deliberate indifference to a serious medical need in violation of clearly established law.

Milton Shane Taylor ("Deputy Taylor" or "Taylor"), David A. Batten ("Deputy Batten" or "Batten"), Robert Eugene Waters ("Jailer Waters" or "Waters"), and Michael A. Johnston ("Jailer Johnston" or "Johnston") (collectively "Defendants") appeal the district court's denial of their motion for summary judgment on qualified immunity grounds on John Burnette's ("Plaintiff") individual capacity claims under 42 U.S.C. § 1983. Because we conclude that Plaintiff has failed to establish a violation of Buster's Fourteenth Amendment rights, we reverse the denial of the individual defendants' immunity.

## Background

Buster Burnette was arrested on 11 September 2003, based on his stepfather's statement that Buster had broken into the stepfather's house and stolen some prescription Duregesic patches that the stepfather used to treat chronic back

2

pain. Before the arrest, Buster's stepfather had gone to the Bacon County Sheriff's Department and met with Defendant Deputy Taylor. Buster's stepfather informed Deputy Taylor that he thought Buster was "strung out" on pills and other drugs. The stepfather also said that his trailer had been broken into and that he suspected Buster had the missing Duragesic patches. In addition, Buster's stepfather told the deputy that Buster had been in detox or drug treatment in the past and that it had not worked.

Then, Deputies Taylor and Batten followed Buster's stepfather back to the place where Buster and his mother were staying. Deputy Taylor confirmed that Buster's stepfather was coming off a bond on a charge for which Buster was out on bail. Buster was arrested. At the time of the arrest, Deputy Taylor observed that Buster had glassy eyes and dilated pupils. Buster's responses to questions were slow, and Buster was in possession of a bottle of prescription pills. It was apparent to Deputy Taylor that Buster was under the influence of something, but Taylor did not smell alcohol.

Deputy Batten assisted in the arrest. He knew Buster was a drug user and frequented the drug traffic area of town. Deputy Batten searched Buster upon arrest. He found a prescription medication bottle in Buster's pocket with between 6 and 8 pills in it. Buster had a prescription for Xanax, which had been filled the

3

day before the arrest. Deputy Batten returned the bottle to Buster, who was already handcuffed.[1] Batten testified that Buster did not look incoherent or drugged but that Batten never looked into Buster's eyes to see whether they were glassy.

Buster was taken to the Bacon County jail, where he was turned over into custody around 6:45 p.m. At the jail, Defendant Waters dressed Buster out and searched him. When he dressed Buster out, Waters found a prescription pill bottle in Buster's underwear. It contained between 3 and 4 pills. The bottle was taken and locked away. Jailer Waters observed Buster stagger while changing clothes and stated, "you're almost wasted; ain't you?" Buster replied that he had just woken up.

Deputy Taylor testified that he spoke with Buster's stepfather again after he dropped Buster off at the jail. Buster's stepfather asked if Buster had patches on his person. Taylor told him that they did not find drug patches in Buster's pockets, but he would have the jail check Buster's body. Taylor then called Jailer Burkette at the jail and asked him to check. Burkette told Taylor they had dressed Buster out and would check again. Jailer Waters testified that he stripped Buster

---

[1]Deputy Batten testified that it was procedure to leave prescription medicine in an arrestee's possession so long as the arrestee could not reach it.

down, searched him, and reported he had found no patches.  Taylor waited on the phone until Burkette came back and told Taylor that Buster did not have a patch on Buster's body.

Buster's stepfather then told Taylor that Buster probably had traded or sold the patches for other drugs because the stepfather had heard that Buster was using cocaine.  He told Deputy Taylor, "I don't want him just locked down in here, you know, just locked down like a dog. . . . [W]e want to try and get him some help."  Buster's stepfather testified that he asked Deputy Taylor to recommend a detox center where Buster's mother and stepfather could send Buster.

Deputies Taylor and Batten left shortly after taking Buster to the jail because they received another call as soon as they walked into the jail.  Both deputies testified that they did not see Buster again after dropping him off at the jail at before seven o'clock in the evening.

Jailer Waters testified that the night shift (Waters was on the day shift and going off duty) determined where to place Buster within the jail.  He recalled telling Shane Burkett (a jailer on the night shift) that Buster should be placed in a holding cell.  Jailer Waters testified that he did not know with what Buster had been charged and that no one spoke to him about Buster's condition.  Waters testified that he did not take Buster back to a cell.

5

Defendant Michael Johnston is a jailer; he first saw Buster at 6:55 p.m. Jailer Johnston was aware that Buster was in possession of a bottle of pills when he was arrested and noticed that Buster's speech was slurred. He was unaware, however, of the missing patches and knew nothing of other drugs Buster might have taken.

Buster was placed in the general population of the jail around 7:15 p.m. Jailer Johnston had the responsibility for Buster's placement within the jail. Johnston testified that no one recommended to him that Buster be placed in a holding cell and that Buster requested to be placed in the general population. Burkett walked Buster back to his cell; another inmate carried Buster's mattress. Buster's cellmates testified that Buster was not able to walk on his own and that the jailer who brought Buster back asked one of the cellmates to make sure Buster got over to the bed without falling.

Jailer Johnston entered the cell at 8:00 p.m. to check on the inmates. Johnston testified that when he returned to the cell again at 9:00 p.m. Buster was "laughing and talking."

At 10:00 p.m., Buster approached Jailer Johnston, asking to move to another cell so that Buster could be with his friends. Johnston agreed, and an inmate helped carry Buster's stuff to the other cell. One of Buster's cellmates observed

6

that Buster's eyes "were barely opened and like rolling behind his head." The cellmate also testified that, around 11:30 p.m., the cellmates heard Buster breathing and "thought he was just, you know, snoring or something."

At midnight, Jailer Johnston opened the pertinent cell's feeding flap and counted the bodies in the cell. He testified that Buster was laying on the mat and talking. At the 1:00 a.m. (12 September) head count, Buster was still laying on the mat but was not talking. Johnston "thought he was snoring." At 2:00 a.m., 3:00 a.m., and 4:00 a.m., Johnston observed Buster laying on the mattress. He was not snoring.

At 5:00 a.m. Jailer Johnston went into the cell and did a "pill call and chow call." He walked around the cell to make sure all of the inmates were getting up. He testified that, at that time, he noticed something was wrong with Buster. He left the cell to get help. Johnston testified that, after he went to get help, someone ran to the door across the day room and starting banging on it saying something was wrong.[2]

---

[2]Whether inmates attempted to warn the jailers before this time is unclear. One of Buster's cellmates testified that "Everybody told them that he needed help." Who exactly he meant by "them" and when this notification occurred are unspecified. Two other cellmates testified they never heard anyone bang on the door for help. Jailer Johnston testified that at no point during the night did anyone mention to him that they thought Buster needed help.

Emergency Medical Services responded to Jailer Johnston's request and determined that Buster had died. The evidence suggests that Buster died after 1:00 a.m. but before 5:00 a.m. The cause of death was polypharmacy: different drugs in combination. The drugs involved were Alprazolam, Hydrocodone, Benzoylecgonine, and Fentanyl.[3] Investigators later learned that, before Buster's arrest, he had eaten one or more of the Duragesic patches, which are intended to be placed on the skin for measured, time-released pain relief over a period of 72 hours.

Plaintiff filed this civil action against Defendants. Defendants submitted a motion to dismiss the "official capacity" claims based on Eleventh Amendment immunity. The district court denied Defendants' motion on the official capacity claims. Defendants then moved for summary judgment on Plaintiff's individual and official capacity claims under 42 U.S.C. § 1983.

A magistrate judge recommended that summary judgment be granted on Plaintiff's official capacity claims and denied on the individual capacity claims. The magistrate also concluded that Defendants were not shielded by qualified immunity. Defendants filed their objection to the report and recommendation.

---

[3]Fentanyl is the drug contained in the Duregesic patch, and Benzolecgonine is a metabolite of cocaine. Alprazolam is the drug contained in Xanax.

The district court concurred with the magistrate judge's report and recommendation. The court dismissed Plaintiff's claims against Defendants in their official capacities and denied Defendants' motion for summary judgment on the individual capacity claims.

<u>Discussion</u>

We review <u>de novo</u> the district court's denial of summary judgment to the Defendants. In doing so, we make no credibility determinations or choose between conflicting testimony, but instead accept Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor. <u>See</u> <u>Evans v. Stephens</u>, 407 F.3d 1272, 1277-78 (11th Cir. 2005) (en banc).[4] _____

To prevail, Plaintiff must prove both an objectively serious medical need and that a Defendant acted with deliberate indifference to that need. <u>Andujar v. Rodriguez</u>, 486 F.3d 1199, 1203 (11th Cir. 2007). This Court has defined a "serious medical need" as one that is diagnosed by a physician as requiring

_____

[4]The parties dispute whether the claim here is governed by the Eighth Amendment or the Fourteenth Amendment. We conclude that this case is governed by the Fourteenth Amendment because Buster was a pre-trial detainee. <u>Lancaster v. Monroe County</u>, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997). The distinction is unimportant, however, because this Court has said that "the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner." <u>Id.</u>

9

treatment or one that is so obvious that a lay person would recognize the need for medical treatment.  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). Because neither party alleges that Plaintiff was ever seen by a physician, Plaintiff must establish for each Defendant that Buster's medical need was so obvious that a lay person—in that Defendant's place—would recognize the need for treatment.

To establish "deliberate indifference," Plaintiff must show that a Defendant had "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence."  Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005).  Plaintiff must demonstrate that a Defendant was "both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [] must also [have] draw[n] the inference."  Farmer v. Brennan, 114 S. Ct. 1970, 1979 (1994).

No liability arises under the Constitution for "an official's failure to alleviate a significant risk that he should have perceived but did not . . . .".  Id.  As such, imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  See Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005) ("[T]he test for deliberate indifference is a subjective test not an objective test for collective knowledge."); Whiting v. Marathon County Sheriff's Dep't, 382 F.3d 700, 704 (7th Cir. 2004) ("Farmer, since it requires the defendant-official to have

actual knowledge of the risk, foreclosed imputed knowledge as the basis for an Eighth Amendment claim of deliberate indifference."). Each individual Defendant must be judged separately and on the basis of what that person knows.[5]

## I. Defendants Deputy Taylor and Deputy Batten

Deputy Taylor was aware that Buster had allegedly stolen some Duregesic patches, which were missing. He had been warned by Buster's stepfather that Buster was "strung out" on pills. Taylor admitted that Buster had glassy eyes and dilated pupils and that he appeared to be under the influence of something. At the time of arrest, Buster was in possession of a bottle of prescription pills. Deputy Batten assisted in the arrest, but testified that Buster did not look incoherent or drugged. Batten admitted, however, that he never looked into Buster's eyes to see whether or not they were glassy. Nothing evidences that either Deputy Taylor or Deputy Batten knew or suspected that Buster had ingested the Duragesic patches or a potentially lethal combination of drugs.

---

[5]The dismissal of Plaintiff's official capacity claims is not before us. We say nothing about those claims.

Based upon the assumed facts, we cannot conclude that it was obvious to either Deputy Taylor or Deputy Batten that Buster had a serious medical need. Deputies Taylor and Batten were responding to a request by Buster's stepfather to take Buster into custody. By the way, at no time did Buster's stepfather or mother request that Buster be given medical treatment or taken to a hospital. The symptoms that Plaintiff alleges Buster was exhibiting at the time of arrest are consistent with some use of drugs or alcohol but not necessarily indicative that medical attention was then required. The Deputies left Buster at the jail several hours—at least, five hours—before his death. Deputy Taylor and Deputy Batten did not violate the federal law.

## II. Defendant Jailer Waters

At the jail, Jailer Waters was in charge of dressing out Buster before going to a cell. Waters testified that he did not know with what Buster had been charged and that no one told him that Buster needed to be looked after or that he needed help. During his search of Buster, Waters found a prescription pill bottle in Buster's underwear. The bottle contained a few pills, and the label indicated it was Buster's prescription. Jailer Waters stated that Buster was "almost wasted,"

12

and Buster replied that he had just woken up. Waters last saw Buster several hours—at least, five hours—before his death. Waters told the night shift, who was responsible for placing Buster in a cell, that Buster should be placed in a holding cell. We cannot conclude that Waters failed to meet the Constitution's commands.

III. Defendant Jailer Johnston

Viewing the facts in the light most favorable to Plaintiff, Jailer Johnston was aware of these facts: (1) Buster was in possession of a bottle of pills when he was arrested; (2) Buster's speech was slurred; (3) Buster needed assistance when he moved—at about ten o'clock p.m.—from his first cell to another cell and that his eyes were rolling back in his head at that time; (4) Buster was making a sound that Johnston interpreted as snoring during the 1:00 a.m. bed check; and (5) at least one of Buster's cellmates banged on a cell door sometime. The facts also establish that Johnston was never aware that Buster might have ingested a lethal amount of drugs. No one ever recommended to Johnston that Buster be placed in

13

a holding cell or otherwise be observed.[6] Johnston observed Buster "laughing and talking" with his cellmates around 9:00 p.m.

Plaintiff has failed to provide evidence indicating Jailer Johnston had notice of Buster's serious medical need. Johnston checked on the inmates at hourly intervals, and no evidence indicates that the inmates said anything about Buster's condition during one of those checks. In addition, Johnston specifically testified that no one ever mentioned to him that Buster needed help.

Plaintiff suggests that Johnston had warning of Buster's condition because inmates at some point banged on their cell door for help. Plaintiff offers no evidence, however, to contradict Jailer Johnston's testimony that he heard inmates banging on the door only after he had discovered that something was wrong with Buster at the 5:00 a.m. check. Also, the inmates who testified to banging on the door for attention did not specify the time and did say that a jailer would be unable to distinguish between a beating for help and one out of anger. In addition, they also testified that the inmates would get in trouble if they banged on the door too frequently or for too long.

---

[6]The evidence establishes that an inmate may have told another jailer, Burkette, that Buster needed to be in a drunk tank. No evidence indicates, however, that Burkette ever communicated that information to Johnston.

14

In the light of these facts, we conclude that Jailer Johnston did not violate Buster's constitutional rights by failing to check on him in addition to the hourly bed checks that Johnston performed throughout the night. Buster did not manifest signs of a serious medical need. His appearance, based on the facts established by Plaintiff, was consistent with some form of intoxication. Although Plaintiff attempts to establish that Jailer Johnston had been warned about Buster's needs, the record does not support this level of notice. At best, Johnston heard banging from cellmates at some point, perhaps after Johnston had discovered the problem himself. These same cellmates, however, said nothing when Johnston came to the cell every hour on the hour.

## Conclusion

On this record, we conclude that none of the Defendants, based upon the information available to him at the pertinent time, deliberately ignored a serious medical condition that was obvious or known to him.[7] See Cottrell v. Caldwell, 85

---

[7]If we are mistaken on this point, we also readily conclude that, given the circumstances, the law was not already clearly established that what any of the individuals did would violate federal law. Bozeman, 422 F.3d at 1270-71 (concluding that qualified immunity attaches unless it is "already clearly established in such a particularized way to make obvious the conclusion for all reasonable, similarly situated jail officials that what Defendants were doing violated [the arrestee's] federal rights under the circumstances"). Immunity would apply.

F.3d 1480, 1490-91 (11th Cir. 1996) (concluding no evidence supported a jury finding that defendant police officers "were consciously aware of and disregarded the risk that [decedent arrestee] would suffocate" as a result of defendants' positioning and restraining decedent arrestee in police car). Cf. Goebert v. Lee County, 510 F.3d 1312 (11th Cir. 2007) (reversing district court's grant of summary judgment for defendants where prison officials took no action when pregnant inmate complained that she had been leaking amniotic fluid for more than a week and needed to see a doctor); Lancaster, 116 F.3d at 1426-27 (involving a chronic alcoholic dying from a withdrawal-induced seizure while in custody after his wife warned jailers about his propensity for life-threatening seizures as he withdraws).

The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol. See Grayson v. Ross, 454 F.3d 802, 809-10 (8th Cir. 2006) (concluding there was no "objectively serious medical need" where the arresting officer and jailers knew the plaintiff was likely under the influence of methamphetamine); Watkins v. City of Battle Creek, 273 F.3d 682, 686 (6th Cir. 2001) (affirming summary judgment for defendant officers and jailers where plaintiff denied swallowing drugs but was observed drooling a pink foamy

16

substance, constantly licking his lips, falling out of a chair, grabbing his stomach, and "appeared to be drunk or high"); Hocker v. Walsh, 22 F.3d 995, 1000 (10th Cir. 1994) (affirming summary judgment for defendant officers and jailers where they did not seek medical treatment for plaintiff who was "obviously . . . intoxicated or under the influence of drugs")

     REVERSED and REMANDED.

WILSON, Circuit Judge, dissenting:

I would affirm the decision of the district court who found that there are genuine issues of material fact that preclude the grant of summary judgment in favor of the defendants on the plaintiff's Eighth Amendment claims. The district court adopted the Report and Recommendation of the Magistrate Judge who conducted an exhaustive review of the record and found that it is "replete with conflicting evidence." The court recognized that "the Defendants could not have reasonably known that Buster had eaten the Duragesic patch which contributed to his death. However, it should be for a jury's determination whether, *inter alia*, Buster exhibited signs of intoxication or being under the influence of an intoxicant; Defendant's knew or should have known that Buster needed medical attention; the cell in which Buster died was not illuminated such that Defendant Johnson could not see into the cell; or fellow inmates tried to obtain help for Buster before he died."

I agree with the district court that "[t]he record before the Court is replete with instances of the existence of genuine issues of material fact . . ." and "[a]t a minimum, the record leaves open the questions of whether Buster exhibited any signs of needing medical attention and whether Defendants disregarded that need."