[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13122

_____

D.C. Docket No. 2:15-cv-02371-RDP

LATUNJA JOHNSON,
as personal representative of the Estate of Sheneque Proctor,

Plaintiff-Appellant,

versus

BESSEMER, ALABAMA, CITY OF,
KARRIE GOODWIN,
OJORE TAMPER,
LONNIE JONES,
MONICA CARAM, et al.,

Defendants-Appellees,

NATHANIEL RUTLEDGE, JR.,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 10, 2018)

Before ED CARNES, Chief Judge, BRANCH, and FAY, Circuit Judges.

PER CURIAM:

Sheneque Proctor was in pretrial detention at the Bessemer City jail when she died from a drug overdose.  Latunja Johnson, her mother and personal representative, filed a lawsuit against Karrie Goodwin, a jail corrections officer who was on duty while Proctor was in detention.  Johnson alleged a single claim of deliberate indifference to a serious medical need.  The district court granted summary judgment to Goodwin, ruling that she was entitled to qualified immunity. This is Johnson's appeal.

## I.     FACTS AND PROCEDURAL HISTORY

### A. Facts

Because Johnson appeals the district court's grant of summary judgment to Goodwin, we view the facts in the light most favorable to Johnson and resolve all reasonable doubts in her favor.[1]  Gerling Glob. Reinsurance Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233–34 (11th Cir. 2001).

On November 1, 2014, Bessemer City police received a dispatch call about a disturbance at an Economy Inn motel.  Officers arrived at the motel around 1:40

---

[1] Johnson argues that the district court did not take the facts in the light most favorable to her and draw all reasonable inferences in her favor.  That argument is beside the point because we review de novo the court's grant of summary judgment, CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1268 (11th Cir. 2006), and determine for ourselves whether the undisputed facts preclude the entry of summary judgment.

p.m. and found Proctor, who was upset because some of her money had gone missing.  After she refused to calm down, she was arrested, handcuffed, and placed in a squad car.  She yelled and cursed on her way to the Bessemer City jail and managed to slip out of her (oversized) handcuffs.  The officers warned her that she would be pepper-sprayed if she kept resisting, but when they arrived at the jail shortly before 2:00 p.m. she was fighting and kicking.  One of the officers gave her a short burst of pepper spray in her face, and then they handcuffed her (with regular cuffs) and carried her into the jail because she refused to walk.  After taking her into the jail, one of the officers returned to the squad car for her personal effects and found a small baggie of marijuana.

The officers handcuffed Proctor to a bench inside the jail.  One of the officers, reading from a form, informed her that the spray was non-toxic and that its effects would dissipate in a short time, but that the effects from the spray might mask other medical conditions, including drug overdoses.  The form stated that failure to answer the questions truthfully could delay medical treatment and jeopardize Proctor's health.  The officer asked Proctor if she was "currently under the influence of, or [had] taken cocaine, amphetamines, barbiturates, PCP, opiates, heroin, or alcohol within the last eight (8) hours."  Proctor refused to answer that question.  She also refused to answer whether she had "heart problems, lung problems, diabetes, high blood pressure, or any other serious medical condition[ ]."

3

And she refused to state whether she had any allergies and whether she had answered the questions truthfully. The officer suspected that Proctor was under the influence of some substance, but he did not see her take any drugs.

Goodwin began her shift at 2:00 p.m. on November 1. After she arrived at the jail around 1:50 p.m., she was sitting in her car in the parking lot when she saw the officers struggling to handcuff Proctor. By the time Goodwin entered the jail, Proctor had already been handcuffed to the bench. As part of the intake process, Goodwin tried to get some information from Proctor, but Proctor cursed and spat at her. After about 20 minutes, Proctor calmed down enough so that Goodwin and another officer could take her handcuffs off, decontaminate her,[2] and dress her in a jail uniform. Goodwin then placed Proctor in a single-person cell. Although Proctor was steady on her feet and her speech was normal, Goodwin believed based on her behavior that she was on some sort of drug.

A little while later another inmate told Goodwin that Proctor was ready to talk. Goodwin took Proctor out of the cell, booked her in, and allowed her to use the phone. As part of the booking process, Proctor had to fill out a medical questionnaire form. The form asked Proctor if she was using any "street drugs," and she wrote on the form that she was using "weed." Proctor did not indicate that she was taking any other drugs. Proctor was cooperative during this time and,

---

[2] The officers decontaminated Proctor by allowing her to use a sink to wash the spray off; Proctor was able to do that herself.

4

according to Goodwin, did not seem "out of it."  Goodwin put Proctor back into her cell around 3:00 p.m.  A jail surveillance video of Proctor's cell shows Goodwin's interactions with Proctor from that point until Goodwin's shift ended at 10:00 p.m.

Goodwin next interacted with Proctor at 4:44 p.m., when she entered the cell to serve Proctor dinner.  Goodwin found her sitting on the edge of the bed, hunched over with her head in her hands.  Proctor did not move or otherwise respond to Goodwin's entry, but she was breathing.  Goodwin touched Proctor on her left shoulder, but she did not respond.  When Goodwin tugged twice at Proctor's left shoulder, Proctor's head and torso moved slightly from the tug but she otherwise did not respond.  Goodwin then grabbed Proctor by both shoulders, laid her on the bed, and lifted Proctor's left leg off the floor and placed it on the bed so that she was laying on her right side with her right leg hanging off the bed. Proctor continued to breathe, but otherwise did not respond to being moved into that position.  An inmate standing in the cell doorway appeared to watch this entire interaction between Goodwin and Proctor; the inmate did not do anything.  After laying Proctor down, Goodwin left the cell and returned a few minutes later with Proctor's food tray.  Goodwin used her right hand to shake Proctor about 10 times before placing the tray in her cell; Proctor did not appear to respond to Goodwin's

5

attempts to rouse her.  Goodwin returned a couple of minutes after that to put a cup next to Proctor's tray.

Sometime after Proctor appeared to be asleep, an inmate told Goodwin that Proctor had told other inmates that she had been taking Xanax bars.  Goodwin testified that she kept a close eye on Proctor because she believed Proctor had taken drugs, but that she was not alarmed by Proctor's state and did not believe that she would die.  Goodwin testified that she was not worried about Proctor in part because there was a regular inmate at the jail who was "always drunk," and that inmate slept in a position similar to Proctor's and would always wake up.  And Goodwin explained that her son is a heavy sleeper and, at times, will not move when she tries to wake him.  Goodwin stated that she has never had any medical or first aid training and does not know the side effects of Xanax.

Goodwin checked on Proctor again at 5:39 p.m. Proctor was in the same position as before — lying on the bed with her right leg hanging over the side.  Goodwin moved to the head of the bed to check on Proctor; Goodwin appeared to nudge Proctor briefly and then walk out.  Proctor was breathing at that point.  Goodwin checked Proctor again at 8:38 p.m. and 9:27 p.m.  Proctor was in the same position and did not move during either check, but she was breathing.  During the 9:27 p.m. check, Goodwin retrieved a blanket and placed it over Proctor before leaving the cell.

6

Proctor was breathing every time Goodwin checked on her. And at some point during Goodwin's shift, Proctor began snoring. One inmate stated that Proctor was asleep when Goodwin entered her cell at 4:44 p.m., that she was asleep and snoring around 9:30 p.m. or 10:00 p.m., and that Proctor was still snoring when the inmate went to sleep around 11:00 p.m. or 11:30 p.m. Goodwin heard Proctor snoring loudly when her shift ended at 10:00 p.m. She believed Proctor was asleep and was not alarmed at how Proctor was lying on the bed. Her only concern was to ensure that Proctor was breathing. She did not feel that Proctor needed any medical attention.

A new shift came on duty at 10:00 p.m. Two officers checked on Proctor at regular intervals throughout the night, and one of them heard her snoring. Just after 4:00 a.m., an officer served breakfast to Proctor and noticed that she was not moving. An officer called the paramedics, who arrived at 4:11 a.m. and pronounced Proctor dead at the scene. The coroner determined the cause of death as polydrug overdose (methadone, cocaine, and alprazolam (Xanax)).

## B.

Johnson filed a lawsuit against Goodwin and a number of other defendants in December 2015. The second amended complaint alleged a single claim against Goodwin under 42 U.S.C. § 1983 for deliberate indifference to serious medical

7

need, in violation of Proctor's Fourteenth Amendment rights as a pretrial detainee.[3]

After discovery, Goodwin moved for summary judgment. The district court

granted the motion, ruling that Goodwin was entitled to qualified immunity

because she was not deliberately indifferent to Proctor's serious medical need and,

even if she was, the law was not clearly established at the time of the alleged

violation. This is Johnson's appeal.

## II.

We review de novo a grant of summary judgment. CAMP Legal Def. Fund,

451 F.3d at 1268. We must "resolve all issues of material fact in favor of the

plaintiff," and then "answer the legal question of whether the defendant is entitled

to qualified immunity." Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002)

(quotation marks and alterations omitted).

## III.

"Qualified immunity protects government officials from liability for civil

damages unless they violate a statutory or constitutional right that was clearly

established at the time the alleged violation took place." Gilmore v. Hodges, 738

F.3d 266, 272 (11th Cir. 2013). To receive qualified immunity, the officers must

---

[3] Johnson also alleged deliberate indifference to serious medical need claims against four other corrections officers. And she brought deliberate indifference claims against the City of Bessemer, Police Chief Nathaniel Rutledge, and Jail Training Director Derick Hudson, claiming that those defendants promulgated customs or policies that led to the denial of medical treatment. The district court granted summary judgment in favor of the four jail corrections officers and it granted motions to dismiss filed by the City, Rutledge, and Hudson. None of those rulings are at issue on appeal — Johnson appeals only the grant of summary judgment to Goodwin.

"first prove that [they were] acting within the scope of [their] discretionary authority when the allegedly wrongful acts occurred." Lee, 284 F.3d at 1194 (quotation marks omitted). There is no dispute that Goodwin was acting in her discretionary authority when she was monitoring Proctor, so the issue is whether she violated Proctor's clearly established constitutional right to be free from deliberate indifference to a serious medical need. Id.

## A. Constitutional Violation

To prevail on her deliberate indifference claim, Johnson "must shoulder three burdens."[4] Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). "First, she must satisfy the objective component by showing that [Proctor] had a serious medical need." Id. Second, Johnson "must satisfy the subjective component by showing that the prison official acted with deliberate indifference to [Proctor's] serious medical need."[5] Id. And third, Johnson "must show that the

---

[4] Because Proctor was a pretrial detainee at the time of the alleged constitutional violation, the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment, governs her claim. Gilmore, 738 F.3d at 271. But we have explained that "the minimum standard for providing medical care to a pretrial detainee is identical to the minimum standard required by the Eighth Amendment for a convicted prisoner." Id.

[5] Johnson argues that she need only satisfy the objective component because of the Supreme Court's holding in Kingsley v. Hendrickson, 576 U.S. __, 135 S. Ct. 2466, 2473 (2015), "that the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." But Kingsley involved an excessive force claim, not a deliberate indifference to serious medical need claim. Id.; see also Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (refusing to reach the issue of whether Kingsley requires a pretrial detainee to satisfy only the objective component in a deliberate indifference claim, but stating that because "Kingsley involved an excessive-force claim, not a claim of inadequate medical treatment due to deliberate indifference," it is not "squarely on point with and does not actually abrogate or directly conflict with" our prior panel

injury was caused by [Goodwin's] wrongful conduct." Id.  Johnson and Goodwin

do not address causation, and we need not address it either in order to decide this

appeal.

### 1.  Serious Medical Need

We have "defined a 'serious medical need' as one that is diagnosed by a

physician as requiring treatment or one that is so obvious that a lay person would

recognize the need for medical treatment." Burnette v. Taylor, 533 F.3d 1325,

1330 (11th Cir. 2008).  Because Proctor was never seen by a physician, Johnson

"must establish . . . that [Proctor's] medical need was so obvious that a lay person

— in [Goodwin's] place — would recognize the need for treatment." Id.  And it

must have been "one that, if left unattended, pose[d] a substantial risk of serious

harm." Nam Dang, 871 F.3d at 1280 (quotation marks omitted).  Johnson argues

that Proctor suffered from a serious medical need because a lay person would

recognize that someone who is non-responsive after consuming an unknown

quantity of drugs requires medical treatment.

That argument fails.  Goodwin did suspect that Proctor had taken drugs

before coming to the jail, and at some point she learned that Proctor had told other

inmates that she had taken Xanax.  But there is no evidence that Goodwin knew

that Proctor had also taken methadone and cocaine, and she testified that she has

---

precedent on deliberate indifference claims) (quotation marks omitted).  Kingsley does not
undermine our earlier Eighth Amendment deliberate indifference precedents.

10

no medical training and does not know the side effects of Xanax.  And the "Constitution does not require . . . [a] jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." Burnette, 533 F.3d at 1333.  In Burnette, a jailer knew that the inmate was in possession of a bottle of pills when he was arrested, that his speech was slurred, that he needed help to move from one cell to another, and that his eyes were rolling back in his head.  Id. at 1332.  The jailer also checked the inmate every hour beginning at midnight; at 1:00 a.m. the inmate was snoring, and at 2:00 a.m., 3:00 a.m., and 4:00 a.m. the inmate was lying on a mattress and not snoring.  Id. at 1329, 1332.  At 5:00 a.m., the jailer noticed that something was wrong with the inmate, called for help, and paramedics determined that he had died from a polydrug overdose between 1:00 a.m. and 5:00 a.m.  Id. at 1329.  We held that evidence was insufficient to show that the jailer had notice of the inmate's serious medical need.  Id. at 1332.

The Burnette case shows that Proctor's medical need was not sufficiently obvious simply because she had taken drugs and was lying on her bed throughout Goodwin's shift.  Johnson emphasizes, and there is no dispute, that Proctor did not wake up after Goodwin prodded her several times, moved her onto the bed, and shook her about 10 times on the shoulder during the 4:44 p.m. check.  But Goodwin did not use any harsher methods to rouse Proctor.  Cf. Taylor v. Adams,

11

221 F.3d 1254, 1256, 1258 n.4 (11th Cir. 2000) (stating that the parties did not dispute that a detainee had a serious medical need where he was found unconscious and the police "could not rouse him despite shaking his leg, rubbing his chest, and splashing water on his chest"). And, more importantly, Proctor's behavior was entirely consistent with someone sleeping heavily: she did not move on the bed and she began snoring at some point during the night. Another inmate stated that Proctor was sleeping as of 4:44 p.m. and was snoring around 9:30 p.m. or 10:00 p.m. And, most importantly, Proctor was breathing every time Goodwin checked on her. Cf. Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) ("No one disputes that Haggard had a serious medical need once his breathing was impaired and he became unconscious."), abrogated on other grounds by Kingsley, 135 S. Ct. at 2473.[6]

Given the difficult to detect line between sleeping and unconsciousness, and the undisputed fact that Proctor was breathing every time Goodwin checked on her, Proctor's need for medical treatment was not so obvious that a lay person would have easily recognized it. Goebert, 510 F.3d at 1326.

---

[6] Johnson argues that this is not a case involving an inmate who was merely intoxicated and sleeping, but instead involves an unconscious inmate. But the problem for Johnson is that the facts, viewed in the light most favorable to her, do not show that it should have been obvious to any reasonable person that Proctor was unconscious instead of merely sleeping.

And Johnson's argument that Goodwin's repeated checks on Proctor show that there was a serious medical need also fails, because the facts indicate that the jail corrections officers routinely checked on all inmates as part of their regular duties. Goodwin testified that she kept an eye on Proctor because she believed she had taken drugs, but saw nothing that alarmed her.

12

2.  Deliberate Indifference

Even if Johnson could satisfy the objective component, she cannot satisfy the subjective component.  To satisfy that component, Johnson must show "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence."  Goebert, 510 F.3d at 1327 (quotation marks and alterations omitted).[7]  Johnson cannot make that showing.

"Subjective knowledge of the risk requires that the defendant be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Nam Dang, 871 F.3d at 1280 (quotation marks omitted); see also Goebert, 510 F.3d at 1327 ("Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . .") (quotation marks omitted).

The facts do not show that Goodwin was aware that Proctor was at a substantial risk of serious harm.  As stated above, Goodwin suspected that Proctor had consumed drugs before entering jail and learned that she had told other inmates that she had taken Xanax, but Goodwin testified that she didn't know the side effects of Xanax.  Goodwin also testified that she believed Proctor was

---

[7] Johnson argues that the subjective component is a jury issue, but we have considered the subjective component at the summary judgment stage.  See Nam Dang, 871 F.3d at 1280–83 (affirming grant of summary judgment to defendants where the record did not show that they were deliberately indifferent to inmate's serious medical need).

sleeping deeply, citing as examples of people who regularly slept deeply another inmate who was often drunk and her own son. Her putting a blanket on Proctor at the 9:27 p.m. check indicates that Goodwin thought Proctor was sleeping, and she was breathing every time Goodwin checked on her. And there is no evidence that any other inmate warned Goodwin about Proctor's condition before her shift ended at 10:00 p.m. See Burnette, 533 F.3d at 1332 (concluding that plaintiff failed to show that the jailer ignored a serious medical need in part because he "checked on the inmates at hourly intervals, and no evidence indicates that the inmates said anything about [the inmate's] condition during one of those checks").[8] As a result, Johnson cannot establish that Goodwin knew that Proctor was at a substantial risk of serious harm.

Johnson also cannot satisfy the remaining two prongs because the facts show that Goodwin did not disregard any risk of serious harm or act with gross negligence: Proctor was breathing and appeared to be sleeping throughout Goodwin's shift, and there is no evidence that she exhibited any symptoms (such as vomiting or seizures), that indicated a deteriorating condition or that she was

---

[8] Johnson relies on the Eighth Circuit's decision in Thompson v. King, 730 F.3d 742, 749 (8th Cir. 2013), in which the court concluded that an officer had subjective knowledge of an inmate's serious medical need where the officer had to "slam his hand on the counter to keep [the inmate] from passing out," was aware that the inmate "exhibited a heightened intoxicated state," believed that the inmate's "intoxication stemmed from prescription seizure medication," observed "noticeable symptoms of severe intoxication," and was warned that the inmate needed help after his body "slid down the window of his jail cell." Those facts are far more extreme than the facts in this case.

suffering from a polydrug overdose. See Goebert, 510 F.3d at 1327 (stating that disregard of the risk can be shown by circumstantial evidence, and that one factor to consider in assessing gross negligence is whether an inmate's medical condition has worsened as a result of a delay in treatment).

Because the evidence taken in the light most favorable to Johnson shows that Proctor did not have a serious medical need and that Goodwin was not deliberately indifferent to any such need, the district court did not err in deciding that Goodwin did not commit a constitutional violation.

## B. Clearly Established Law

Even if Johnson could show that Goodwin was deliberately indifferent to Proctor's serious medical need, she cannot establish that any violation was clearly established. We have explained that it is "clearly established that an official acts with deliberate indifference when he intentionally delays providing access to medical treatment, knowing that the [inmate] has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." Valderrama v. Rousseau, 780 F.3d 1108, 1121 (11th Cir. 2015) (quotation marks and alterations omitted). But the problem for Johnson is that it was not clear that Proctor was suffering from a polydrug overdose and that she needed medical treatment. Johnson cites no decision that would have made it "obvious that [Goodwin's] acts violated [Proctor's] rights in the specific set of circumstances at issue" in this case.

15

Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010).  Because of that and the fact it was not clear that Goodwin's failure to provide medical care to Proctor amounted to deliberate indifference, even if Goodwin did violate Proctor's constitutional rights she would still be entitled to qualified immunity.  See id. ("[I]f a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question.  Minor variations between cases may prove critical.") (citation omitted).

## IV.    CONCLUSION

Goodwin did not violate Proctor's constitutional right to be free from deliberate indifference to a serious medical need and, even if she did violate that right, any such violation was not clearly established.

**AFFIRMED.**[9]

---

[9] Although this case was originally on the oral argument calendar, it was removed under 11th Circuit Rule 34-3(f).