[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14439
Non-Argument Calendar

_____

D.C. Docket No. 5:16-cv-00521-MHH

WHITNEY ELIZABETH FOSTER,

Plaintiff-Appellee,

versus

CASSIE MALONEY,
SHEREE KING,
JOYCE WILLIAMS,
BENZILLA ANDERSON,
MILDRED PATTON,
CHARITY BEASLEY,
SHELBY SPICER,
FELICIA DESHIELDS,
EMILY NOBLES,
JERRY MORRISON,
Administrator of Steve Morrison's estate,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(October 10, 2019)

Before JORDAN, BRANCH and BLACK, Circuit Judges.

PER CURIAM:

Appellants Cassie Maloney, Sheree King, Joyce Williams, Benzilla Anderson, Mildred Patton, Charity Beasley, Shelby Spicer, Felicia Deshields, Emily Nobles (collectively, the "correctional officers"), and Jerry Morrison (as administrator of Steve Morrison's estate), all in their individual capacities, appeal the district court's order denying their Federal Rule of Civil Procedure 12(b)(6) motion to dismiss the claims against them on the ground those claims are barred by qualified immunity and/or state immunity doctrines. After review, we affirm.

## I. BACKGROUND

### A. Procedural History

This lawsuit concerns claims by Whitney Foster, who, at all times relevant to the instant appeal, was being held at Madison County Jail following her arrest. In her amended complaint, Foster alleged that, while incarcerated at the Madison County Jail, she did not receive adequate treatment for various health issues stemming from methadone withdrawal. She asserted claims of deliberate indifference to medical needs and conspiracy to violate civil rights, pursuant to 42 U.S.C. § 1983, as well as state-law tort claims for medical malpractice, negligent correctional care, wantonness, and civil conspiracy. She named as defendants Madison County (the County), Advanced Correctional Healthcare, Inc. (ACH), Dr.

Arthur Williams, certain nurses at the jail, Madison County Sheriff Blake Dorning, Jail Administrator Steve Morrison,[1] and certain correctional officers. The instant appeal concerns only the claims against the correctional officers and Morrison.[2]

All of the defendants filed motions to dismiss the amended complaint for failure to state a claim. As is relevant to this appeal, both the correctional officers and Morrison asserted the § 1983 claims against them were barred by qualified immunity, and the correctional officers additionally argued the tort claims against them were barred by state immunity doctrines. The district court denied Appellants' motions and allowed the case to continue to discovery. The instant appeal followed.

### B. Factual Allegations

Given the procedural posture of the case, we will review the specific allegations of the amended complaint as if the allegations contained therein were true. While Foster's claims against ACH and the County are not before us on appeal, it is necessary, for context, to briefly recount Foster's allegations concerning ACH's relationship with the County.

---

[1] Foster's original complaint named Steve Morrison as a defendant. Thereafter, and before Foster filed her amended complaint, Morrison passed away, and his Estate was substituted as the party defendant. For the sake of clarity, this opinion will simply refer to "Morrison" throughout.

[2] The amended complaint alleged claims of deliberate indifference, negligent correctional care, and wantonness against the correctional officers, and claims of deliberate indifference and conspiracy to violate civil rights against Morrison.

Pursuant to its contract with Madison County, ACH provides healthcare services to inmates at the Madison County Jail. The contract capped outside medical care costs at $200,000 per quarter, and in any quarter in which costs fell below that cap, ACH was permitted to keep the difference as profit. Foster alleged this perversely incentivized ACH personnel to cut costs by refusing to refer inmates to outside care providers when necessary, resulting in "unnecessary inmate suffering." She further alleged Sheriff Dorning and Morrison encouraged the correctional officers to defer to ACH personnel, though the officers were aware that ACH had a practice of delaying or denying referrals that "put cost control over inmate health and safety." According to Foster, at least six inmates died as a result of these policies and the failure of ACH and correctional personnel to provide inmates with basic medical care.

Moving on to the specific factual allegations giving rise to Foster's claims against Appellants, Foster was arrested and booked at the Madison County Jail on April 4, 2014. Prior to her arrest, Foster had been taking 80 milligrams of methadone per day, administered by a methadone clinic. Morrison and the correctional officers—along with members of the medical staff at the jail—were aware Foster had been taking methadone prior to her booking.

Within a week of her incarceration, Foster began showing visible signs of methadone withdrawal, as well as elevated blood pressure. These symptoms grew

4

more severe each day, but the defendants "did nothing to help her."  Instead, the nurses and correctional officers accused her of "faking" as she slurred her speech, bit her tongue, and exhibited limited control of her body.  Foster was seen in the clinic on April 18, 2014, given ibuprofen, and put on a blood-pressure "watch" for three days.

Starting on April 21, 2014, Foster's condition became "desperate," and she continued to deteriorate until she was sent to the Huntsville Hospital emergency room on April 23, 2014.[3]  Specifically, on April 21, Foster began having strokes and seizures as a result of her untreated high blood pressure.  At one point, an inmate in the cell with Foster called for medical assistance because she was "shaking and sweating," and Foster was temporarily moved to a medical cell, where she was observed to be lethargic and slurring her words.  Rather than provide her with comfort or adequate medical care, the correctional officers and nurses on duty "harassed and ridiculed" Foster and "watched [her] deteriorate."

By the next day, April 22, Foster could no longer sign her name to forms, dial a phone, or remember her "charge code" for making phone calls.  Another inmate used her own charge code and helped Foster call her mother, and Foster

---

[3] The nine correctional officers named in the amended complaint were the officers on duty over the course of these three days, and were able to observe Foster's worsening condition. Specifically, Officers DeShields and Nobles were on duty on April 21, Officers Maloney, Patton, Spicer, Beasley, and Williams were on duty on April 22, and Officers Williams, Anderson, and King were on duty on April 23.

told her mother with slurred speech that she was "gonna die."  During commissary, the correctional officers on duty left Foster to "lay on the ground" until another inmate asked them to send for a nurse.  Some of the correctional officers later had to physically put Foster in the shower because she had urinated on herself. Throughout the day, the officers on duty "saw [Foster] shaking, sweating, and knew she was having strokes."  Again, the officers and nurses on duty "harassed and ridiculed" Foster rather than provide her with comfort or adequate medical care.

Later that night, another inmate requested emergency assistance for Foster, and when Officers Spicer and Beasley arrived, they found Foster in her bunk "twitching" and complaining that she hurt all over.  They helped her into a wheelchair and took her to triage, where a nurse instructed them to take her to a medical cell for observation.  While being assessed, Foster twice slid out of the wheelchair and had to be helped back up by the officers and nurse.

By the next morning, April 23, Foster's condition had become even more desperate.  The correctional officers on duty again observed Foster shaking, sweating, and exhibiting symptoms of strokes and seizures.  When a nurse came to check on Foster, she was found "lying on the floor with her upper body under the bed."  When the nurse was unable to get Foster off the floor, she called a doctor, who ordered that Foster be sent to the Huntsville Hospital emergency room for

6

treatment "due to signs of a stroke." When Foster arrived at the hospital, she "looked like she had been beaten," and was blind and partially paralyzed.

Foster remained hospitalized for three weeks and was diagnosed with Posterior Reversible Encephalopathy Syndrome, which she alleged is no longer fully reversible. Foster has some use of her arms and legs, but the repeated strokes and seizures caused permanent neurological deficits and cortical blindness.

Throughout this three-day period, Foster alleged her need for medical care "was such that it would have been obvious to even a layperson that she needed to be sent to a hospital."

## II. DISCUSSION

We review *de novo* a district court's denial of qualified immunity. *Jordan v. Doe*, 38 F.3d 1559, 1563 (11th Cir. 1994). "The determination of whether a complaint sufficiently alleges a constitutional violation also is a matter of law reviewed *de novo.*" *Corollo v. Borria*, 833 F.3d 1322, 1328 (11th Cir. 2016). "In reviewing a complaint, we accept all well-pleaded factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Id.*

### A. Qualified Immunity

"A complaint is subject to dismissal under Rule 12(b)(6) when its allegations, on their face, show that an affirmative defense bars recovery on the claim." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). When the

affirmative defense of qualified immunity is advanced, the complaint must be dismissed unless "the plaintiff's allegations state a claim of violation of clearly established law." *Id.* (quotation omitted).  Absent such allegations, "[i]t is . . . appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003).

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In this case, the parties do not dispute that Appellants were acting within their discretionary authority.

Once a defendant establishes he was acting within his discretionary authority, the burden shifts to the plaintiff to show the defendant is not entitled to qualified immunity.  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).  The Supreme Court has established a two-part test to determine the applicability of qualified immunity.  Thus, to conclude Foster's claims against Appellants are not subject to dismissal, we must answer two questions in the affirmative: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"; and (2) Was that right

8

"clearly established" at the time of the alleged conduct? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). These questions may be answered in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Foster alleged claims of deliberate indifference to serious medical needs against both the correctional officers and Morrison. However, because the claims against Morrison arise out of his supervisory and policymaking role—as opposed to his personal participation in the alleged failure to provide Foster with adequate medical care—we need to address the claims against him separately.

### 1. *Claims Against the Correctional Officers*

The correctional officers argue Foster's amended complaint failed to plausibly allege either that they violated a constitutional right—deliberate indifference to a serious medical need—or that any such right was clearly established at the time of the alleged conduct. We will address each prong of the analysis in turn.

We turn first to whether the allegations in the amended complaint plausibly allege the correctional officers violated Foster's right to be free from deliberate indifference to her serious medical needs. To state such a claim, the complaint must have alleged the following elements: (1) a serious medical need; (2) defendants' deliberate indifference to that need; and (3) a causal link between the defendants' indifference and Foster's resulting injury. *See Mann v. Taser Int'l,*

*Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).  The correctional officers'

arguments on appeal concern the second element: deliberate indifference.  To

establish this element, Foster must show "(1) subjective knowledge of a risk of

serious harm; (2) disregard of that risk; (3) by conduct that is more than gross

negligence."  *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)

(quotation and alteration omitted).

The correctional officers insist the allegations in the amended complaint do

not establish they had subjective knowledge of any risk of serious harm to Foster.

They argue the amended complaint contains vague and conclusory allegations,

fails to make sufficiently individualized allegations concerning what each of them

knew, and fails to allege they, as non-medical jail staff, were qualified to assess

whether the medical care Foster was receiving at Madison County Jail was

adequate.  They further insist Foster alleged no facts from which one could

conclude any officer disregarded any risk by failing to provide medical care, as the

amended complaint itself acknowledges Foster was seen by medical personnel at

the jail.

With respect to the "subjective knowledge" component, a defendant "must

both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference."  *Farmer v.

Brennan*, 511 U.S. 825, 837 (1994).  "No liability arises for 'an official's failure to

10

alleviate a significant risk that he should have perceived but did not.'" *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (quoting *Farmer*, 511 U.S. at 838).

Foster alleged her medical condition over the three days during which the correctional officers were on duty was so obvious that even a lay person—like the correctional officers—would have recognized that she was not receiving adequate treatment. We acknowledge the amended complaint includes several conclusory statements concerning, for example, the severity of Foster's medical condition and her obvious need for hospitalization. But these conclusions are supported by specific factual allegations in the amended complaint from which reasonable inferences can be drawn. The amended complaint therefore provides more than mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In particular, the amended complaint alleged the correctional officers observed Foster as her condition became increasingly dire over the course of three days. She exhibited symptoms such as slurred speech, biting her tongue, limited control of her body, inability to ambulate without assistance, incontinence, shaking, and sweating. She suffered several strokes and seizures, becoming increasingly incoherent and nonresponsive over the course of the three days the named correctional officers were on duty. Rather than ensure Foster was provided with adequate medical care, the correctional officers "harassed and ridiculed"

11

Foster and "watched [her] deteriorate." These allegations are sufficient to plausibly allege the correctional officers were subjectively aware of Foster's serious medical needs and deliberately disregarded them, resulting in severe, and potentially permanent, damage.[4] *See Townsend*, 601 F.3d at 1158.

We are unpersuaded by the correctional officers' argument they lacked the medical expertise to comprehend the alleged severity of Foster's condition and simply deferred to the judgment of the medical personnel on staff. It is generally true that a lay correctional officer cannot be liable for medical staff's diagnostic decisions or be expected to second guess those decisions in most circumstances. *See Townsend*, 601 F.3d at 1159 (concluding a plaintiff could not show that non-medical jail officers were subjectively aware of her emergent medical condition where the officers "had been told by a medical professional that [the plaintiff] was not presenting an emergency"). But we have acknowledged that an inmate or prisoner's medical situation may in some cases be so obviously dire that correctional officers may be held liable regardless of whether medical personnel are also aware of the situation. *See id.* (concluding the officers were entitled to qualified immunity where the plaintiff had not "presented evidence that her

---

[4] We also reject the correctional officers' assertion the amended complaint did not sufficiently identify the particular actions (or lack of action) taken by each of the individual correctional officers. The amended complaint specifically alleges which officers were on duty during each of the three days during which Foster's condition seriously deteriorated and, to the extent practicable prior to discovery, identifies when specific officers observed or were involved in particular incidents.

12

situation was so obviously dire that . . . lay deputies must have known that a medical professional had grossly misjudged [her] condition").

The factual allegations, as discussed above, paint a picture of a person suffering from and exhibiting extremely concerning symptoms such that her situation was "obviously dire." Whether the correctional officers possessed the medical expertise to specifically diagnose the cause of Foster's symptoms, they were able to observe the seriousness of her condition. Assuming all of Foster's allegations are true, as we must at the motion to dismiss stage, the failure of the correctional officers, in the face of Foster's obviously dire condition, to personally take any action beyond informing medical personnel would constitute deliberate indifference to Foster's serious medical needs.

We similarly are unpersuaded by the correctional officers' assertion that any constitutional right they allegedly violated was not "clearly established." A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation and alteration omitted). There are several ways in which a plaintiff may establish that the law gave an official fair notice that his conduct violated a constitutional right: (1) by "show[ing] that a materially similar case has already been decided"; (2) by "point[ing]to a broader, clearly established principle that should control the novel facts of the situation; or

13

(3) by showing that "the conduct involved in the case . . . so obviously violate[s] the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (quotation omitted).  As discussed above, our precedent contemplates liability for non-medical correctional officials where they fail to take any action beyond informing medical personnel in the face of a plainly dire medical situation.  *See Townsend*, 601 F.3d at 1159.

Accordingly, we affirm the district court's denial of the correctional officers' motion to dismiss Foster's § 1983 claims on the basis of qualified immunity.

### 2.  Claims Against Morrison

Morrison was not alleged to have been personally involved in the alleged failure to provide Foster with adequate medical care.  Instead, Foster sought to hold him liable in his supervisory and policymaking role as Administrator of the Madison County Jail.

While § 1983 does not allow for liability on the basis of respondeat superior or vicarious liability, *see Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994), supervisor liability under § 1983 is appropriate "when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation," *Cottone*, 326 F.3d at 1360.

> The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a

14

supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Id.* (quotations, alterations, and citations omitted).

As we stated above, Foster's complaint plausibly alleges a claim for deliberate indifference to serious medical needs.  Foster's supervisory claim against Morrison includes allegations that Morrison and others implemented "deliberately-indifferent customs or policies" by establishing an "explicit or implicit agreement, plan, and policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills."  Officers were trained to defer to ACH personnel even in the case of a medical emergency and disciplined for contacting outside emergency personnel.  Morrison knew "ACH had a practice of delaying or denying referrals of inmates for outside medical care . . . that put cost control over inmate health and safety."  Foster alleged Morrison and others were "on notice that their plan was harmful to the health of detainees and jailees" from complaints, deaths, and other lawsuits.  Further, Morrison and others did not take steps to investigate the circumstances of the deaths of six Madison County Jail inmates over the course of four years.

The alleged conduct states a claim for supervisor liability by alleging a causal connection between Morrison's actions and the deliberate indifference to

15

Foster's serious medical needs.  If proven, the conduct would establish Morrison was aware that inmates were denied adequate medical care pursuant to a policy with an effort to control costs, that ACH denied referrals to outside providers when necessary, that inmates suffered serious harm as a result, and that Foster had serious medical needs that were ignored.

While Morrison contends he is entitled to qualified immunity, Foster has pled facts showing that Morrison violated her Fourteenth Amendment right to be free from deliberate indifference to her serious medical needs by establishing a causal connection between Morrison's actions and the constitutional deprivation. Further, as stated above, Foster's right to be free from deliberate indifference to her serious medical needs was clearly established at all times during her incarceration. We affirm the district court's conclusion that Morrison is not entitled to qualified immunity at this stage of the proceeding.[5]

### B.  Immunity Under Alabama Law

In addition to the § 1983 claims against all Appellants, the amended complaint also alleged state-law tort claims against the correctional officers. Specifically, the complaint alleged claims of negligent correctional care and

---

[5]  Morrison challenges in a footnote the district court's determination that he is not entitled to qualified immunity on the § 1983 conspiracy to violate civil rights claim against him. He has abandoned this issue by not plainly and prominently raising it. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

wantonness against all nine officers.  On appeal, the officers argue the district court erred in declining to dismiss these claims under Alabama's Jailer Liability Protection Act and the common law doctrine of state-agent immunity.

As amended by the Jailer Liability Protection Act, section 14-6-1 of the Alabama Code provides correctional officers the "same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law."  Ala. Code § 14-6-1. Among those "protections" granted sheriffs under the Alabama Constitution is sovereign immunity from suit "when they are executing their law enforcement duties."  *Johnson v. Conner*, 754 F.3d 918, 919 (11th Cir. 2014).

Alabama state-agent immunity shields state employees from tort liability regarding discretionary acts unless they acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law; violated federal or constitutional law; or did not comply with Alabama laws, rules, or regulations.  *Hollis v. City of Brighton*, 950 So. 2d 300, 307-08 (Ala. 2006).

The correctional officers insist they are entitled to immunity under section 14-6-1 and the doctrine of state-agent immunity because the amended complaint does not plausibly allege that any of them failed to act "in compliance with the law."  But in light of our conclusion the amended complaint plausibly alleged the

17

correctional officers violated Foster's constitutional rights by being deliberately indifferent to her serious medical needs, it necessarily follows it similarly alleged they were not "acting in compliance with the law," and they "violated federal or constitutional law." *See Taylor v. Hughes*, 920 F.3d 729, 734-35 (11th Cir. 2019) ("[Section] 14-6-1 and state-agent immunity do not immunize the guards from liability under state law if they violated [the plaintiff's] constitutional rights." (citing *Ex parte Rizk*, 791 So. 2d 911, 913-14 (Ala. 2000) (stating state-agent immunity does not protect state agents "when the Constitution or laws of the United States . . . require otherwise"))).

## III.  CONCLUSION

Accepting Foster's facts as contained in her complaint as true, she has alleged sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, we affirm the district court's denial of Appellants' motions to dismiss the amended complaint on qualified immunity and state immunity grounds.

**AFFIRMED.**