[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14842

_____

D.C. Docket No. 6:14-cv-00037-GAP-TBS

NAM DANG, by and through his Power of Attorney, VINA DANG

Plaintiff - Appellant,

versus

SHERIFF, SEMINOLE COUNTY FLORIDA,
OLUGBENGA OGUNSANWO, M.D.,
SANDRA WILT, RN,
BRENDA PRESTON-MAYLE, RN,
ALECIA SCOTT, LPN,
in their individual capacities, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 25, 2017)

Before ROSENBAUM, BLACK and SENTELLE,[*] Circuit Judges.[1]

SENTELLE, Circuit Judge:

Nam Dang's health deteriorated while he was a pretrial detainee in the John E. Polk Correctional Facility (the "Jail").  Ultimately, Dang was diagnosed with meningitis, which caused him to suffer multiple strokes resulting in permanent injuries.  Dang alleges § 1983 liability against several health care providers for providing inadequate medical care while Dang was in Jail and Seminole County Sheriff Donald Eslinger in his official capacity as Sheriff.  The district court granted summary judgment for all the defendants.  Dang brought the present appeal.  We affirm the judgment.

## I.    BACKGROUND

### A. Facts

On December 22, 2011, officers of the City County Investigative Bureau ("CCIB") stopped Dang's car.  Dang alleges the officers pulled him from his vehicle, slammed him to the ground, and put a knee on his neck before ultimately releasing him.  After this incident, Dang started experiencing headaches and neck pain, and started taking large doses of Aleve for relief.  When the pain continued,

---

[*] Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia, sitting by designation.

[1] We withdraw our opinion issued on May 9, 2017, and replace it with this one.

Dang went to an emergency room on January 12, 2012.  He declined the recommended testing to rule out meningitis.

On January 26, law enforcement officers arrested Dang.  Dang's mother advised the arresting officers that he was experiencing neck pain and headaches.  The officers did not allow Dang's mother to give him any medication, but permitted her to place a medicated patch on his neck before he was taken to Jail.  After booking, Dang was asked several questions about his health during his intake screening.  Dang's vitals were normal, and he did not inform the intake officer that he was experiencing neck pain or headaches.

On January 29, Dang was seen by Nurse Sandra Wilt, LPN, pursuant to a "nurse sick call."  Dang advised Wilt that he was experiencing "[m]oderate to severe head and neck pains," possibly a "pinched nerve," and a "[s]tiff neck."  After checking Dang's eyes and the range of motion of his neck, Wilt observed that he had minimal pain.  Wilt ordered Motrin and a muscle rub and put in an order for Dang to be seen by a doctor to get a prescription for Robaxin, a muscle relaxant.

Pursuant to Wilt's order, Dang saw Dr. Ogunsanwo, MD, on February 1.  Dang stated he was experiencing headaches, neck pain, and neck stiffness.  Dang told Ogunsanwo about the incident with the CCIB when he was allegedly "yanked out" of the car and "slammed on the ground."  After performing a physical exam on

3

Dang, Ogunsanwo noted that Dang had full range of motion in his cervical spine with mild pain elicited, normal gait, and no neurological deficit. His temperature was 98.9. Ogunsanwo continued Dang on the Motrin and muscle rub ordered by Wilt and prescribed Robaxin.

On February 7, Brenda Preston-Mayle, RN, evaluated Dang and completed a History and Physical Health Evaluation. Dang informed Preston-Mayle about the incident with the CCIB and that he had been experiencing head and neck pain. He also described vision and hearing problems. Preston-Mayle took Dang's vitals and noted a temperature of 98.9. His weight was recorded as 132, eight pounds less than his intake weight. Preston-Mayle offered to have Dang see a dental, mental, or medical health doctor, but Dang declined.

On February 9, Alecia Scott, LPN, saw Dang. Dang stated he had a headache and that "no one was doing anything for him." Scott assessed Dang and checked his vitals. She recorded that he had full range of motion to his neck with no swelling or redness. Dang was ambulatory and did not appear to be in distress. However, Dang had a fever of 101.5. Scott provided Dang with his Motrin and Robaxin, advised him to drink plenty of fluids, and observed him for 15 to 20 minutes before releasing him to his pod.

Shortly after Dang left the medical unit, Scott went to the hallway and saw Dang on the floor against the wall. An officer told Scott that Dang had "snatched

4

away and slid down on the wall and sat on the floor." Dang did not respond verbally to the officer's request that he "get up." Scott found Dang's behavior "bizarre" and told him that if he continued to behave that way, he would end up on suicide prevention. Dang got up and walked away. Scott later directed Dang to mental health segregation for observation and directed that his blood pressure be monitored for five days. Later that night, Scott checked on Dang and noted his temperature was down to 97.9. His behavior and appearance were normal and she noticed no problems.

On February 20, Sharyle Roberts, LPN, was notified of a "Code Orange" medical emergency regarding Dang. Roberts documented that Dang's pupils were equal and reactive to light, his blood pressure was 136/85, and he had a temperature of 99. Roberts noted that Dang appeared to be passed out, was drooling, and exhibited fluttering eye syndrome. Roberts believed the behavior was voluntary because Dang wiped the drool from his mouth and when the room was quiet, he "would open his eyes, look around, and then close his eyes again." Roberts heard from Scott that he had engaged in similar behavior two weeks prior. Roberts admitted Dang to the infirmary and referred him to both medical and mental health doctors.

On February 21, Dr. Valerie Westhead, MD, a psychiatrist, conducted a mental status examination of Dang. Dang had a headache, a drop in blood pressure, and

felt odd, but denied hallucinations, delusions, or mood complaints. Westhead concluded that Dang had an idiosyncratic reaction to the muscle relaxants but no psychiatric issues. Westhead cleared Dang psychiatrically.

On February 22, Martha Densmore, RN, saw Dang during her morning rounds. Dang was rocking back and forth in his hard plastic "boat" bed, but Densmore was able to check his vitals and determined they were normal. Densmore testified that he was alert, oriented, and voiced no complaints.

The next morning, Dang informed Densmore of his two-week headache. After observing that Dang had white patches on his tongue, a 99-degree temperature, and was unsteady when he attempted to stand, Densmore requested that Ogunsanwo see Dang. A few hours later, Densmore observed Dang with his head in the toilet trying to spit. He was incontinent and very weak. Densmore asked Ogunsanwo to see him right away. Ogunsanwo examined Dang and suspected he could have meningitis. Ogunsanwo directed that Dang be transported to the ER via a sheriff's patrol car, where he was diagnosed with meningitis several days later.

## B. Procedure

Dang filed suit alleging § 1983 liability against the Jail's health care providers (excluding Westhead) for providing inadequate medical care and against Seminole County Sheriff Donald Eslinger in his official capacity as Sheriff for employing the customs that resulted in the alleged inadequate care. The district court granted

6

summary judgment for the defendants.  The court held, *inter alia*, that Dang's constitutional right to medical care was not violated because—even assuming a serious medical need—the health care providers were not deliberately indifferent to Dang's needs.  In light of the determination that Dang suffered no constitutional deprivation, the court found no basis for supervisor liability against the Sheriff.  The court denied Dang's subsequent motion to amend its judgment pursuant to Rule 59(e).  Dang appealed.

## II. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment *de novo*.  *Kingsland v. City of Miami*, 382 F.3d 1220, 1225 (11th Cir. 2004).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We "view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.  All reasonable doubts about the facts should be resolved in favor of the non-movant."  *Clemons v. Dougherty Cty.*, 684 F.2d 1365, 1368–69 (11th Cir. 1982) (citations omitted).

### B. Qualified Immunity

Qualified immunity protects government officials if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, . . . protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

1.  Discretionary Authority

To be entitled to qualified immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* (internal quotation marks and citations omitted).  An official acts within his discretionary authority if his actions (1) were undertaken "pursuant to the performance of his duties," and (2) were "within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988); *see also Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (noting that an official acts within his discretionary authority if he "perform[s] a legitimate job-related function . . . through means that [are] within his power to utilize").

All of the health care providers acted within the course and scope of their discretionary authority in providing care to Dang.  While Dang concedes that three of the health care providers acted within their discretionary authority in caring for him, he argues that the LPNs—Wilt, Scott, and Roberts—did not.  However, the

8

Seminole County Sheriff's Office required the LPNs to, *inter alia*, complete "physical assessments on inmates in accordance with medical protocol" and conduct "daily nurse's sick call." This is consistent with the Florida Nurse Practice Act, which provides that LPNs perform "selected acts, including the administration of treatments and medications, in the care of the ill, injured, or infirm" and "the promotion of wellness, maintenance of health, and prevention of illness of others under the direction of a registered nurse [or] a licensed physician . . . ." Fla. Stat. § 464.003(19). Indeed, Dang alleges in his complaint that "[a]t all times material hereto" each LPN "was acting under the color of state law within the course and scope of her employment . . . and was empowered by the state of Florida to provide nursing services . . . ." Each LPN acted within the scope of her delegated authority, so each exercised discretionary authority in caring for Dang.

2. Constitutional Violation

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. A court evaluating a claim of qualified immunity must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right

9

was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).

As a pretrial detainee, Dang alleges inadequate medical care under the Fourteenth Amendment rather than the Eighth Amendment. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Nevertheless, Dang's claims are evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment. *Goebert*, 510 F.3d at 1326. To prevail on his § 1983 claim for inadequate medical treatment, Dang must show (1) a serious medical need; (2) the health care providers' deliberate indifference to that need; and (3) causation between the health care providers' indifference and Dang's injury. *Id.*[2]

a. Serious Medical Need

---

[2] Dang argues that following *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015), a pretrial detainee alleging constitutionally deficient medical care need not show deliberate indifference. We cannot and need not reach this question. First, *Kingsley* involved an excessive-force claim, not a claim of inadequate medical treatment due to deliberate indifference. Therefore, it is not "squarely on point" with and does not "actually abrogate or directly conflict with," *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) (citations and quotation marks omitted), our prior precedent identifying the standard we apply in this opinion to Dang's claim. Second, even if we were free to consider what, if any, implications *Kingsley* might have for the claims of pretrial detainees involving inadequate medical treatment due to deliberate indifference, *Kingsley* could not help Dang. *Kingsley* itself notes that even when it comes to pretrial detainees, "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley*, 135 S. Ct. at 2472 (emphasis in original; citations and quotation marks omitted). In *Dang*'s case, as tragic as the facts are, all we have is, at most, negligence. So regardless of whether *Kingsley* could be construed to have affected the standard for pretrial detainees' claims involving inadequate medical treatment due to deliberate indifference, whatever any resulting standard might be, it could not affect Dang's case.

10

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). In either case, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (citations, internal quotations marks, and alteration omitted). As did the district court, we assume for purposes of summary judgment that Dang demonstrated a serious medical need.

b.  Deliberate Indifference

To establish deliberate indifference, Dang must prove (1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than mere negligence. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Subjective knowledge of the risk requires that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099–1100 (11th Cir. 2014). "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (citations omitted).

11

An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009).  Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs.  *See Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) (citing *Brown v. Hughes*, 894 F.2d 1533, 1537–39 (11th Cir. 1990)).  Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted).  However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

Dang alleges that each health care provider was aware of Dang's "symptoms consistent with meningitis" and "knew that meningitis was a serious and life-threatening condition that warrants immediate medical treatment."  Nonetheless, Dang claims, each provider "ignored clear signs and symptoms of Nam Dang's serious medical needs and life-threatening condition which prevented Nam Dang

12

from timely getting the critical medical care he required . . . ." We consider those claims as to each defendant.

i. Nurse Wilt

Wilt encountered Dang on one occasion, January 29, 2012, when he informed Wilt of his "moderate to severe head and neck pains," "strain[ed] neck muscle," "possible pinched nerve," and "stiff neck." Wilt did not ignore Dang's symptoms, but performed an assessment by checking his eyes and the rotation of his neck. After the assessment, Wilt ordered that Dang take Motrin and a muscle rub before referring him to Dr. Ogunsanwo. Dang argues that Wilt should have taken his vital signs, but does not suggest why that was necessary or would have been helpful. Indeed, Dang's vitals were taken 36 hours later with normal results. The failure to take Dang's vitals under these circumstances cannot be said to be so grossly incompetent or inadequate as to "shock the conscience." *Rogers*, 792 F.2d at 1058. Wilt was responsive to Dang's complaints and provided treatment she deemed appropriate at that time. Wilt did not violate Dang's constitutional rights and is therefore entitled to qualified immunity.

ii. Nurse Preston-Mayle

Dang alleges that Preston-Mayle was deliberately indifferent to his medical needs during their encounter on February 7, 2012, when Dang informed her of his head and neck pain as well as vision and hearing problems. Dang alleges that

13

Preston-Mayle failed to recognize Dang's symptoms and returned him to general population without attempting "to further evaluate his deteriorating condition." But Preston-Mayle took Dang's vitals, which were within normal range. She noted that Dang was coherent, alert, oriented, and even joked with her. In short, Dang presented no signs that were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326. Nevertheless, Preston-Mayle offered to send Dang to a medical doctor, which he declined. The undisputed evidence shows that Preston-Mayle was not deliberately indifferent to Dang's medical needs and is therefore entitled to qualified immunity.

iii.    Nurse Scott

Dang alleges that Scott was deliberately indifferent to his medical needs during their encounter on February 9, 2012, when Dang told her of his headaches and neck pain. Scott assessed Dang and took his vitals. When she saw that Dang had a fever of 101.5, she administered his prescribed medication. After administering the medication, she held Dang in the infirmary for observation for at least fifteen minutes, advised him to drink fluids, and put in orders for his blood pressure to be monitored for five days. When Dang slid to the floor after leaving the infirmary, Scott became concerned about potential medical health issues and referred him to "DPod" for mental health observation, where nurses would see him twice daily. Scott followed up with Dang later that evening to check his temperature, which

14

was back within the normal range.  At that time, Dang stated that he was okay and his behavior and appearance were normal.  Scott's care does not "shock the conscience"; indeed, Dang's symptoms improved under her care.

Dang takes issue with the fact that Scott "mov[ed] him to segregation without instituting the segregation assessment protocol."  But it is not clear how this assessment would have shed light on Dang's condition or prompted additional care, and the evidence suggests that such assessments are not used to identify and assess the health of detainees.  A violation of Jail policy does not in itself rise to the level of deliberate indifference.  *See Andujar v. Rodriguez*, 486 F.3d 1199, 1204 n.5 (11th Cir. 2007).  Dang also alleges that Scott was present for the Code Orange on February 20, 2012, a fact that is in dispute.  But even if Scott was present for that encounter, she was not deliberately indifferent for the reasons explained below.  Scott is therefore entitled to qualified immunity.

iv.    Nurse Roberts

During the Code Orange on February 20, 2012, Roberts observed Dang appearing unconscious, drooling, non-verbal, and unable to sit up.  Roberts assessed Dang, noting that his vitals were normal and his pupils were equal and reactive to light.  Although Roberts may have incorrectly believed Dang's behavior was voluntary, "mere negligent" misdiagnosis is not a constitutional violation. *Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991).  And despite her belief, she

15

admitted Dang to the infirmary where he would be seen by both medical and mental health doctors. Based on this undisputed evidence, Roberts was not deliberately indifferent to Dang's medical need.

Dang asserts that Roberts failed to check him that night, leaving him to "languish[]" in his cell and suffer additional harm. Although Dang was observable in the infirmary, there is no evidence that he made any complaints or that his condition deteriorated. Dang points to the testimony of his former cell-mate, Anthony Laird, and his girlfriend, Sarah Agurkis, in support of his claim that his condition deteriorated in his infirmary cell that night. However, Laird's affidavit is not clear on dates, and Dang references it in regard to events on February 20, 21, and 23. And Agurkis testified that she "believe[s]" she visited him on February 19, so any direct observations she made cannot support his claims regarding February 21.

Because Roberts was not deliberately indifferent to Dang's medical need, she is entitled to qualified immunity.

v.    Nurse Densmore

Densmore examined Dang on February 22, 2012. Although he exhibited weakness, Dang was sitting up and Densmore noted that his vitals were normal and he was alert and oriented. Dang did not voice complaints about his pain. The next day, after observing that Dang had white patches on his tongue, a 99-degree

16

temperature, and was unsteady on his feet, Densmore requested that Ogunsanwo see Dang. When, a few hours later, Densmore observed Dang with his head in the toilet, incontinent and weak, she requested that Ogunsanwo see Dang immediately. Far from ignoring Dang's medical need, Densmore referred Dang to a medical doctor, and then ensured that the doctor came immediately when Dang's condition worsened. Densmore's decision not to take further action under these circumstances, even in the light most favorable to Dang, was not a constitutional violation. Densmore is therefore entitled to qualified immunity.

### vi.    Doctor Ogunsanwo

Ogunsanwo first interacted with Dang on February 1, 2012, when Dang complained of headaches and neck pain. When the results of Dang's physical exam were normal, Ogunsanwo continued Dang on Motrin and a muscle rub and prescribed a muscle relaxant for his pain. Dang seems to have abandoned any challenge relating to Ogunsanwo's actions on February 1, but regardless, his undisputed actions were reasonable and do not support a finding of deliberate indifference.

Ogunsanwo next interacted with Dang on February 23, 2012. After examining Dang, Ogunsanwo immediately directed him transported to the ER in a patrol car. The only issue that Dang raises before us is that he remained in the infirmary for over 40 minutes before being transported to the hospital, but he cites no relevant

17

evidence in support of his conclusion.  Evidence suggests that there was about a 15-minute delay in Dang's transport.  In this context, a 15-minute delay is not a constitutional violation.  *See Harris*, 21 F.3d at 393-94.

Dang also suggests that Ogunsanwo indirectly learned of Dang's deteriorating condition on February 13, 2012, when he approved an order for blood pressure checks due to Dang's fever.  Fever, Dang claims, is inconsistent with Ogunsanwo's initial diagnosis of muscular skeletal pain and indicates a more serious condition.  But even assuming Ogunsanwo knew Dang had a one-time fever, his actions were not deliberately indifferent.  *See Farmer*, 511 U.S. at 838 (finding no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not").

Because Ogunsanwo was not deliberately indifferent to Dang's medical needs, he is entitled to qualified immunity.

### C. Supervisor Liability

Dang argues that the policies and practices of Donald Eslinger, Sheriff for Seminole County, caused the violation of his constitutional right to adequate medical care.  In light of the Court's determination that there was no constitutional deprivation, there is no basis for supervisor liability.  *See Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008); *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir.

18

2007).  Accordingly, the district court's grant of the Sheriff's motion for summary judgment is affirmed.

## III. CONCLUSION

For the reasons set forth above, the district court's decision granting the defendants' motions for summary judgment is affirmed.