[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11913
Non-Argument Calendar

_____

D.C. Docket No. 6:17-cv-01423-GAP-LRH

WILLINE BRYANT and MAX
GRACIA SR., as co-personal
Representatives of the Estate of
Max Gracia, Jr., II,

Plaintiffs-Appellees,

versus

ROBERT J. BUCK, III,
KAREN CLAIRMONT,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 5, 2019)

Before JORDAN, JILL PRYOR, and ANDERSON, Circuit Judges.

PER CURIAM:

Max Gracia Jr., II, sustained wounds from dog bites during his arrest on August 6, 2015. Four days later, he died in his jail cell at Orange County Corrections from septic shock, which resulted from his wounds becoming infected. The personal representatives of his estate sued various jail officials under 42 U.S.C. § 1983, alleging that they were deliberately indifferent to Mr. Gracia's serious medical needs. The district court denied the summary judgment motions of two of the defendants, Dr. Robert J. Buck, III and Registered Nurse Karen Clairmont, concluding that qualified immunity did not shield them from liability. We now review Dr. Buck's and Nurse Clairmont's interlocutory appeal from that order. For the following reasons, we affirm in part and reverse in part. Dr. Buck was entitled to summary judgment based on qualified immunity, but Nurse Clairmont was not.

**I**

The relevant facts at the summary judgment stage are as follows.[1]

On August 6, 2015, Mr. Gracia incurred dog bite wounds to his legs and hands from a police canine during his arrest. He was taken to Orlando Regional Medical Center for treatment. Following his discharge from the hospital, he was admitted to the infirmary at Orange County Corrections.

---

[1] On summary judgment, we view the facts in the light most favorable to the non-moving party. *See McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009).

Dr. Buck, a licensed physician and the Medical Director of Orange County Corrections, admitted Mr. Gracia. As Mr. Gracia had sustained multiple dog bites, had a history of seizures, and was HIV positive, Dr. Buck ordered daily dressing changes, antibiotics, anti-seizure medication, and pain medications. Dr. Buck also noted that his staff should inquire about Mr. Gracia's use of Atripla, an HIV medication, and that he should possibly restart it. After this initial intake, Dr. Buck did not see or inquire about Mr. Gracia again.

Over the next two days, nurses continued to monitor Mr. Gracia. They recorded that his wounds were reddened with scant, serosanguineous drainage.

On the morning of August 9, 2015, Mr. Gracia complained of weakness and dizziness. The nurse on duty took his vitals and recorded a "dramatically abnormal" pulse and an "elevated respiratory rate," though his temperature, blood pressure, and oxygen saturation were normal. *See* D.E. 95-1 at 39–40. Believing Mr. Gracia was dehydrated from vomiting the day before, the nurse ordered him to increase his fluids.

That evening, when Nurse Clairmont reported to the infirmary for her shift, the nurse who was on duty during the day informed her that she had taken Mr. Gracia's vitals and his pulse and respiratory rate were elevated. She also informed Nurse Clairmont that he had complained about dizziness and weakness.

At around 9:00 p.m., Nurse Clairmont went to Mr. Gracia's cell to give him his evening medications.  She wrote a progress note stating:

> 9:00 p.m. Patient observed twisting himself and moaning loudly on bed during med pass when asked by staff to sit up for his pm meds.  Patient cried, "I can't do it," and proceeded to slide his body onto the floor near the foot of his bed.  Patient refused all assistance and refused all care from nursing staff.  Patient's dressings on . . . [his] calf and upper left thigh are noted to be heavily soiled with dried, bloody, drainage upon assessment. Will encourage patient to allow wound care. Will continue to monitor.

D.E. 85-7.

Nurse Clairmont testified in her deposition that she did not change Mr. Gracia's dressings at this time because "[h]e was refusing care."  D.E. 85-1 at 80.  She further testified that based on her assessment of Mr. Gracia during this encounter, she determined that it was not necessary to take his vital signs.  There is no evidence that she made any assessment of Mr. Gracia at this time beyond her visual observations of his dressings and his demeanor.

Nurse Clairmont believed Mr. Gracia to be "faking or exaggerating his medical condition." D.E. 95-1 at 179.  As a result, he was issued a disciplinary report.

To continue observing Mr. Gracia, Nurse Clairmont had him moved to a camera-monitored cell in the infirmary at around 11:16 p.m.  From the time that he was transferred, until 5:15 a.m., Nurse Clairmont did not visit Mr. Gracia.

At 5:15 a.m., an officer called Nurse Clairmont to Mr. Gracia's cell and notified her that Mr. Gracia was not breathing. He was rushed to the emergency

4

department and pronounced dead within the hour.  An autopsy confirmed that Mr. Gracia's cause of death was "septic shock as a result of infected dog bite wounds." D.E. 95-1 at 180.

## II

The personal representatives of Mr. Gracia's estate sued Dr. Buck, Nurse Clairmont, Orange County, and three other nurses.  They alleged that the defendants were deliberately indifferent to his serious medical needs in violation of the United States Constitution.[2]

Dr. Buck and Nurse Clairmont each filed separate motions for summary judgment based on qualified immunity.  Two of the other defendants, Elsa Galloza-Gonzalez and Lynn Marie Harter, joined Dr. Buck's motion for summary judgment. The plaintiffs did not oppose, and the district court granted, summary judgment in favor of Nurse Gonazelz and Nurse Harter.  The parties stipulated to dismiss Maryanne Evans after she filed for personal bankruptcy.

The district court denied Dr. Buck's and Nurse Clairmont's requests for summary judgment.  The district court explained that a reasonable jury could find Dr. Buck deliberately indifferent as a medical provider because he "examined an

---

[2] The district court dismissed the claim against Orange County because it did not have a policy that caused Mr. Gracia's injury and the plaintiffs did not plausibly allege a widespread pattern of deliberate indifference.

5

HIV positive patent with a severe dog-bite wound and deliberately declined to play any active role in his subsequent treatment." D.E. 103 at 9–10. It further determined that a jury could find Dr. Buck liable as a supervisor based on his "policies and customs," noting that the infirmary was extremely understaffed and nurses often treated patients, rather than doctors. D.E. 103 at 10–11. As to Nurse Clairmont, the district court concluded that a reasonable jury could find that she was deliberately indifferent by ignoring Mr. Gracia's apparently serious medical condition based on her unfounded belief that he was malingering.

Dr. Buck and Nurse Clairmont filed this interlocutory appeal. A denial of summary judgment based on the determination that a government official is not entitled to qualified immunity for alleged constitutional deprivations is immediately appealable. *See Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985).

## III

We review *de novo* a district court's denial of a summary judgment motion based on qualified immunity and resolve all issues of fact in favor of the plaintiffs. *See McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009). Summary judgment is appropriate if the evidence before the court demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

When a government official asserts a qualified immunity defense, he bears the initial burden of showing that "he was acting within his discretionary authority." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018) (citation and internal quotation marks omitted). Once he makes this showing, the burden shifts to the plaintiff to show that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)). Here, it is undisputed that Dr. Buck and Nurse Clairmont were acting within their discretionary authority, so we begin our analysis at the second step.

The plaintiffs contend that Dr. Buck and Nurse Clairmont violated Mr. Gracia's constitutional rights by being deliberately indifferent to his serious medical needs, in violation of the Fourteenth Amendment. To establish a deliberate-indifference claim, they must demonstrate: (1) that Mr. Gracia had a serious medical need; (2) that the defendants were deliberately indifferent to that need; and (3) that the defendants caused Mr. Gracia's injury. *See Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019).[3]

---

[3] As a pretrial detainee, Mr. Gracia's deliberate indifference claim is governed by the Fourteenth Amendment, rather than the Eighth Amendment. *See Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 (11th Cir. 2017). His claims, nevertheless, are evaluated under the same standard as a prisoner's deliberate indifference claim under the Eighth Amendment. *See id.*

7

## IV

We analyze whether the district court correctly denied summary judgment for Dr. Buck and Nurse Clairmont in turn.

### A

Deliberate indifference has three components: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Lane v. Philbin*, 835 F.3d 1302, 1308 (11th Cir. 2016) (citation and internal quotation marks omitted). The plaintiffs cannot demonstrate that Dr. Buck was deliberately indifferent to Mr. Gracia's medical needs, as his treating physician or as a supervisor.

### 1

Dr. Buck only treated Mr. Gracia on August 6, 2015, when he admitted him to the Orange County Corrections infirmary. Even the plaintiffs' expert, Dr. Thomas D. Fowlkes, testified in his deposition that he did not believe Dr. Buck breached the standard of care in his treatment of Mr. Gracia during this initial intake.

The district court concluded that Dr. Buck's failure to take further action after the initial intake constituted deliberate indifference, relying on our decision in *Taylor*, 920 F.3d at 734. In *Taylor*, a pretrial detainee died from internal bleeding after he was kept in a jail holding cell overnight. *See id.* at 731. The jail guards were not entitled to qualified immunity because even though they knew the inmate

had been in a car crash that day, they ignored him crying out in pain for several hours. *See id.* at 734.

Unlike the situation in *Taylor*, Dr. Buck did not ignore Mr. Gracia while knowing that he was at risk of serious harm. Instead, at a time when Mr. Gracia appeared to be stable, Dr. Buck had his full-time medical staff take over his care. There is no evidence that delegating follow-up visits to nurses rather than doctors was negligent, let alone more than "mere negligence." *See Lane*, 835 F.3d at 1308. *See also Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) ("[M]edical treatment violates the Constitution only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'") (citation omitted). Indeed, Dr. Fowlkes testified that he did not believe there "was any requirement for [Dr. Buck] to physically return to see Mr. Gracia at any point before his death[.]" D.E. 95-1 at 24. On this record, Dr. Buck's treatment of Mr. Garcia was not deliberately indifferent to his medical needs.

**2**

The district court also denied Dr. Buck qualified immunity because there "remain[ed] material questions of fact as to whether, as a supervisor, [Dr.] Buck's policies and customs resulted in deliberate indifference." D.E. 103 at 10. Specifically, the district court concluded that Dr. Buck could be liable based on two of the infirmary's policies or customs: (a) the treatment policy made little distinction

between nurses and doctors; and (b) the infirmary was severely understaffed. *See id.* at 10–11.

The district court's analysis seems to conflate the municipal liability claim that was initially pled against Orange County with the supervisory liability claim pled against Dr. Buck. The plaintiffs initially alleged that Orange County's policies and practices—including its failure to properly fund, train, and staff the Orange County Corrections infirmary—resulted in deliberate indifference. That claim was dismissed because the plaintiffs did not plausibly allege that such policies or customs existed. The supervisory liability claim against Dr. Buck, in contrast, asserted that he failed to properly supervise Mr. Gracia's treatment and care.[4]

A supervisor cannot be liable under § 1983 based on vicarious liability or respondeat superior. *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). But a supervisor may be liable if he "personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id.*

Dr. Buck did not personally participate in the unconstitutional conduct, as discussed above. The plaintiffs assert, however, that Dr. Buck caused the

---

[4] Even if the claim against Dr. Buck were based on the policies or practices identified by the district court, the plaintiffs could not show that such policies caused Mr. Gracia's death. The plaintiffs do not allege that Mr. Gracia died because nurses were incapable of properly treating him or because of understaffing. Instead, as discussed below, they claim that Nurse Clairmont was monitoring Mr. Gracia but failed to treat him because she believed he was malingering.

10

constitutional violation by failing to adequately train his nursing staff in recognizing the onset of sepsis.  He may be liable for failure to train if he had "actual or constructive notice that a particular omission in the[ ] training program cause[d] [his] employees to violate citizens' constitutional rights," and "armed with that knowledge," chose to retain the training program.  *See Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1052 (11th Cir. 2014) (citation and internal quotation marks omitted).  Actual or constructive notice may be established by showing a pattern of similar constitutional violations by untrained employees.  *See id*. at 1053.

There is no evidence that, prior to this incident, Dr. Buck had reason to believe the nurses on his staff lacked adequate training to recognize sepsis.  Although the plaintiffs alleged that there had been other incidents of deliberate indifference by medical staff at Orange County Corrections, none of them involved sepsis.  Accordingly, Dr. Buck cannot be liable for failure to train.  *See id.  See also Cottone*, 326 F.3d at 1361–62 (holding that the plaintiffs could not state a claim against the supervisors for failing to train or supervise officers because there were no allegations that the defendants knew about the officers' unconstitutional conduct so they were not on notice of the need to correct or stop it).

Because the plaintiffs failed to show that Dr. Buck violated the constitution, we do not reach the "clearly established law" prong of the qualified immunity

analysis. *See Cottone*, 326 F.3d at 1362. Dr. Buck is entitled to qualified immunity and the district court erred in denying his motion for summary judgment.

## B

In evaluating whether Nurse Clairmont was entitled to qualified immunity, the district court correctly decided the threshold inquiry—that the plaintiffs made a sufficient showing that she violated Mr. Gracia's constitutional rights. But the district court failed to reach the next step of the analysis: determining whether the right was clearly established. As we explain, it was.

First, viewing the evidence in the light most favorable to the plaintiffs, as we must, the record supports that Nurse Clairmont was deliberately indifferent to Mr. Gracia's serious medical needs. When she started her shift on August 9, 2015, she knew that Mr. Gracia had recently sustained dog bites, that his pulse and respiratory rate were elevated, and that he had complained about dizziness and weakness. Her own progress notes reflect that later that evening she saw him "twisting himself and moaning loudly on the bed," crying "I can't do it," and sliding his body onto the floor near the foot of his bed. *See* D.E. 85-7. Yet, other than ordering that he be moved to a camera-monitored cell, she did not take any action. She did not change his dressings, perform an assessment, or check his vitals, despite the infirmary's policy requiring nurses to take patients' vital signs once per shift.

Nurse Clairmont argues that she did not have subjective knowledge of the risk of sepsis because (a) she mistakenly believed Mr. Gracia was malingering, and (b) she did not know that he was at risk of septic shock specifically. A reasonable jury could find that she was aware of his serious medical needs—despite her contention that she believed he was faking—because there was ample evidence that he was suffering, and she did not even perform an assessment to verify if he was malingering. *See Taylor*, 920 F.3d at 734 (holding that guards could not willfully disregard evidence that the inmate required medical assistance based on the Trooper's statement that he was "just drunk"). Nor did Nurse Clairmont need to know specifically that Mr. Gracia was at risk of sepsis to have knowledge of his medical needs. *See id.* (explaining that officers can be liable for deliberate indifference even if they do not know a detainee's "specific medical condition"). *See also McElligott v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999) (holding that a jury could infer that the prison medical staff were aware of a substantial risk of harm to the inmate, even though they did not know he had cancer, because they were aware he was in pain).

Nurse Clairmont also contends that her care was not "grossly incompetent" because she continued to monitor Mr. Gracia. She relies on *Dang v. Sheriff, Seminole County, Florida*, 871 F.3d at 1282, for support. She compares her conduct to that of one of the nurses in *Dang*, who also incorrectly believed that an inmate's

13

behavior was voluntary. *See id.* There, however, the nurse assessed the inmate, "noting that his vitals were normal and his pupils were equal and reactive to light," despite her mistaken belief of malingering. *See id.* Here, in contrast, Nurse Clairmont performed no such assessment, letting Mr. Gracia suffer for hours as his condition deteriorated. A jury could find that monitoring him—without doing any medical assessment whatsoever or checking his vitals—amounted to no care at all. *See McElligott*, 182 F.3d at 1257 (holding that a reasonably jury could find prison medical staff deliberately indifferent because they knew the extent of the inmate's pain but did nothing to treat him or respond to the deterioration of his condition). The situation might be different had Nurse Clairmont done some sort of a check or assessment. But that is not what happened.

Second, Nurse Clairmont's failure to treat Mr. Gracia violated his clearly established constitutional rights. At the time of Mr. Gracia's incarceration, "it was clearly established that knowledge of the need for medical care and intentional refusal to provide that care constituted deliberate indifference." *See Harris v. Coweta Cty.*, 21 F.3d 388, 393 (11th Cir. 1994). *See also McElligott*, 182 F.3d at 1257 ("Our cases . . . have recognized that prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain."). The record reflects that from at least around 9:00 p.m., until around 5:15 a.m. (about 8 hours), Nurse Clairmont knew that Mr. Gracia—who had sustained dog bites—was crying out in

14

pain and lying on the floor, but she failed to take any action to assess or treat him. Accordingly, the district court correctly concluded that Nurse Clairmont is not entitled to qualified immunity and properly denied her motion for summary judgment.

## V

We reverse the district court's denial of summary judgment for Dr. Buck, but we affirm the denial of summary judgment for Nurse Clairmont. We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**