[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10647

Non-Argument Calendar

_____

WILLIAM SIMS,

Plaintiff-Appellant,

*versus*

ALEXIS FIGUEROA,
Sued in his individual capacity,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:18-cv-00892-MMH-JBT

_____

Before WILLIAM PRYOR, Chief Judge, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

William Sims, a state inmate, appeals the summary judgment against his complaint that Dr. Alexis Figueroa acted with deliberate indifference by providing inadequate treatment for Sims's rectal bleeding. 42 U.S.C. § 1983. The district court ruled that prison medical records "refute Sims' claim." After careful review of the record, we affirm.

## I. BACKGROUND

We divide our background into two parts. First, we describe Sims's medical treatment. Second, we describe the proceedings in the district court.

### A. Sims's Treatment

As part of his treatment for prostate cancer, Sims took narcotics that caused constipation, gastrointestinal bleeding, and hemorrhoids. On August 16, 2017, prison officers transported Sims for a colonoscopy. Sims had a polyp removed and left with instructions to return in eight weeks for a follow-up examination. A few days later, Sims experienced rectal bleeding and received a "dose of magnesia." Sims's gastroenterologist determined that "the cause of rectal bleeding was an inflamed hemorrhoid."

On August 30, 2017, Sims was transferred to Suwannee Correctional Institution Annex, where Dr. Figueroa became his

primary healthcare provider. On September 8, 2017, Sims reported "ongoing rectal bleeding," and Dr. Figueroa referred Sims for a "reg[ular] 1st post-op visit for biopsy results and [a] plan of care" with a gastroenterologist. But after Dr. Figueroa consulted with the regional medical director, the doctor cancelled his referral and put Sims on an alternate treatment plan.

On October 12, 2017, Sims "was seen by Gastroenterology" "for [a] follow up" examination, and his oncologist, Dr. Vernon Montoya, prepared a progress note addressing Sims's condition and treatment plan. Dr. Montoya ordered that Sims "continue with Lupron," a hormone used to treat advanced prostate cancer, and return for a "[f]ollow up in three months" for tests. Dr. Montoya "ma[de] a referral back to Gastroenterology" because "[i]t [was] unclear why [Sims] was ATP'd as he had a colonoscopy and he was found to have a polyp as well as hemorrhoids" and he had "continued GI bleeding," which made "GI follow up actually appropriate." After Sims returned to Suwanee, he was "seen in hematology" where a nurse recorded that Sims would see his doctor with lab testing in three months, he had a "emergent referral for his gastro matter," and he complained of continuous bleeding after his colonoscopy.

The next day, Dr. Figueroa recorded that Sims had seen his oncologist, that "no new changes in [his treatment] plan ha[d] been order[ed]," that he should "continue on Lupron," and that follow up "will cont[inue] on site." Dr. Figueroa ordered that Sims would

receive "lab[oratory tests] in 3 months" and "if significant alteration then it will be consulted again."

On October 30, 2017, Sims reported that he had "gross rectal bleeding" that started months ago, but he requested only renewal of his medicine. On November 15, 2017, Sims requested medical treatment for "gross rectal bleeding" and complained he "not been evaluated nor treat[ed]." Sims submitted additional requests for treatment of "gross rectal bleeding" on November 20 and December 1. Sims received "routine" treatment by a nurse after submitting each request.

On December 6, 2017, Sims reported to sick call three times for rectal bleeding. A nurse detected blood on Sims's hemoccult cards and scheduled a medical follow-up.

On December 14, 2017, Dr. Figueroa examined Sims. Sims complained that he was "tired of this problem that won't go away." Dr. Figueroa performed a "rectal exam[, which] show[ed] that inflamed hemorrhoids [were] still present" from being detected when Sims "had polyps removed on 8/16/17." The doctor prescribed Sims a stool softener, a laxative, and hydrocortisone cream.

Two days before seeing Dr. Figueroa, Sims filed a grievance alleging that he had "not received any form of medical treatment" to address his rectal bleeding. Sims complained that the "regional office," which "denied his follow up with [the] gastro clinic" and instead recommended an "alternative treatment plan" was being "deliberately indifferent to his serious health care needs."

On December 28, 2017, Dr. F. Cruz denied Sims's grievance. Dr. Cruz responded that Sims was "being followed in Chronic Clinic for [his] medical condition" and had been "seen in sick calls[,] . . . referred to the MD[,] and seen on 12/14/17 to address these concerns." Dr. Cruz stated that Sims had a "pending consult to Oncology to further address the bleeding" with an "appointment . . . pending soon," and he could "address [concerns] with medical by access[ing] sick call."

On January 11, 2018, Sims returned to Dr. Montoya, who recorded that Sims "was supposed to get a follow up colonoscopy, but this has not yet been done." Dr. Montoya ordered a "follow up in three months" for Sims's "prostate cancer." Dr. Montoya recorded that Sims had "also been noted with GI bleeding on colonoscopy" and "[w]e will re-consult Gastroenterology" as "[t]his is urgent, due to possible GI bleeding."

On January 16, 2018, Sims reported to sick call complaining of dizziness and blurred vision. A registered nurse checked his blood sugar and blood pressure and performed an eye exam. The nurse sent Sims's "[c]hart to MD for consideration of optometry consult and renewal of Lupron injection."

On January 20, 2018, Dr. Figueroa recorded that Sims, having seen his oncologist, would have follow up "cont[inued] on site" and receive "lab work . . . in 3 months." Dr. Figueroa noted that "rectal bleeding [was] already found and discussed with" Sims and that there would be "no further action until [his] next onc[ology] app[ointment]."

On January 31, 2018, Sims requested medical treatment for "continuous rectal bleeding," and a nurse gave him ibuprofen and vitamins recommended by his oncologist. On February 6, and March 13, 2018, Sims reported rectal bleeding without requesting medical treatment and received "routine" care from nurses on both occasions. On April 16, 2018, Sims requested information about "gastro," and on April 23, 2018, Sims requested medication renewal and information about "medical supplies" for his "continuous rectal bleeding and pain." Although Sims did not request treatment, he saw nurses after submitting his two requests.

On February 23, 2018, Sims filed a second grievance, which Dr. Cruz denied. Sims complained that Dr. Figueroa had not ordered a gastroenterology consult. Dr. Cruz responded that "there was no indication that [Sims] had been denied access to or denied medical care," that Dr. Figueroa had performed a "record review" on January 20, and that Dr. Montoya's progress note regarding a gastroenterology consult was a "recommendation," which "the staff MD reviews and determines the plan of treatment and care." Dr. Cruz stated that Sims was "followed in Chronic Clinic on a regular basis with appointments pending" and "[i]f [he] had medical concerns . . . [he could] access sick call to have them addressed." Sims filed an appeal, which was returned to him as untimely.

On July 5, 2018, Sims saw Dr. Montoya for a follow-up examination. Dr. Montoya recorded that Sims had a "GI bleed on colonoscopy . . . and even though a referral was made it has not yet been done." The doctor ordered that Sims return in three months

and "again refer[red] [Sims] to Gastroenterology" because "[t]his is urgent . . . to evaluate GI bleeding."

On July 9, 2018, Dr. Figueroa recorded that Sims's "request for [gastroenterology] consult has been discussed with [the regional medical director] and due to the fact that GI stated on 8/16/17 that the cause of rectal bleeding was an inflamed hemorrhoid[,]" "[t]his could be handled on site." Dr. Figueroa also recorded that Sims had "no complaint at site of rectal bleeding."

On September 11, 2018, Sims requested medication renewal and information about "medical supplies." He reported a "reoccurence of rectal bleeding." The nurse classified Sims's condition as "urgent."

On October 4, 2018, Sims returned to Dr. Montoya, who recorded that Sims had been "noted with a recent rectal bleed" and had been "referred to Gastroenterology times two, but still has not yet been seen." Dr. Montoya recorded that Sims had a "[p]ossible GI bleed" even though his "[s]tool is guaiac negative on examination." But Dr. Montoya waited until January 10, 2019, to refer Sims for a "routine" consultation with gastroenterology. Dr. Figueroa added Dr. Montoya's treatment plans to Sims's medical records.

In June 2019, Sims was transferred to another prison. On April 3, 2020, Sims saw Dr. Xiaoyo Li, a gastroenterologist, who examined Sims to determine the cause of his "continued . . . constipation, on/off GI bleeding, [and] severe hemorrhoids on narcotics due to his prostate cancer meds." Dr. Li recommended that

Sims undergo a sigmoidoscopy and have his hemorrhoids banded. The doctor also prescribed dulcolax and movantik to treat Sims's constipation.

## B. Proceedings in the District Court

On July 20, 2018, Sims filed a complaint that alleged Dr. Figueroa's "deliberate indifference and delay in medical care result[ed] in advanced prostate cancer." Sims alleged that Dr. Figueroa agreed to refer Sims to a gastroenterologist, but canceled the referral "because he had his own treatment plan in place." Sims also alleged that he received no "form of medical treatment" at Suwanee until he saw Dr. Figueroa in December 2017, and his refusal to refer Sims to a gastroenterologist was "to save money" and made Dr. Montoya "furious." Sims requested an award of compensatory and punitive damages and an injunction requiring Dr. Figueroa to "immediately arrange for . . . follow up treatment . . . by an outside specialist in the field of gastroenterology."

Dr. Figueroa filed a motion to dismiss, which the district court granted in part and denied in part. The district court dismissed Sims's claim against the doctor in his official capacity. The district court rejected the doctor's arguments to dismiss the complaint for lack of exhaustion of administrative remedies, for failure to state a claim of deliberate indifference, and as barred by qualified immunity. The district court also rejected the doctor's argument to dismiss Sims's claim for compensatory and punitive damages on the basis his physical injuries were no more than de minimis. 42 U.S.C. § 1997e(e).

Later, Dr. Figueroa moved for summary judgment, and the district court granted the motion. The district court found that "Sims' exhibits establish" the doctor "regularly examined [him], prescribed medication, discussed his treatment plan, and on two occasion[s] requested a gastroenterology consultation for him" and "refute Sims' claim that Figueroa ignored Sims' rectal bleeding." The district court also found that "Figueroa, in discussion with the regional medical director, determined Sims' rectal bleeding was caused by his hemorrhoids and could be handled onsite at the prison," and "the gastroenterologist who saw Sims in April 2020 determined the same, although he prescribed a different treatment plan." "Based on this record, [the district court could not say] that Figueroa ignored Sims' serious medical issue" or that his treatment "was so grossly incompetent as to shock the consci[ence] or that it caused an exacerbation of his condition." The district court also rejected as "unavailing" Sims's argument that "cost-savings played a role in Figueroa's treatment."

## II. STANDARD OF REVIEW

We review *de novo* a summary judgment. *Adams v. Poag*, 61 F.3d 1537, 1542 (11th Cir. 1995). We view the facts and draw all reasonable inferences from those facts in favor of the non-movant. *See id.* Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

To prevail on a claim of deliberate indifference, a prisoner must prove that his physician knew of and disregarded a risk of serious harm to his health. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). "[D]eliberate indifference describes a state of mind more blameworthy than negligence" and "requires more than ordinary lack of due care for the prisoner's interests or safety." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The physician "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Medical treatment violates the prohibition against cruel and unusual punishment in the Eighth Amendment "only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (internal quotation marks omitted).

Sims failed to establish that Dr. Figueroa was deliberately indifferent to Sims's rectal bleeding. Dr. Figueroa initially referred Sims to see a specialist, but after reviewing his medical records and consulting with a supervisor, the doctor concurred with the gastroenterologist who treated Sims post-colonoscopy that his hemorrhoids caused his bleeding. In the months following, when Sims reported rectal bleeding, he received medical treatment from the nursing staff and his bleeding lessened. And after a test detected blood in Sims's stool, Dr. Figueroa performed a rectal exam, determined that the bleeding was due to Sims's inflamed

hemorrhoids, and prescribed a conservative treatment that caused the bleeding to subside. Sims later reported a reoccurrence of bleeding, but his guaiac test detected no blood in his stool. This record refutes Sims's argument that his "medical care . . . [was] so cursory as to amount to no treatment at all." See Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989). Sims's medical records establish that Dr. Figueroa monitored Sims and administered treatment that addressed the bleeding caused by his hemorrhoids.

Dr. Figueroa's medical decision to disregard Dr. Montoya's four recommendations to refer Sims to a gastroenterologist did not constitute deliberate indifference. "It is obduracy and wantonness, not inadvertence or error in good faith, that violates the Eighth Amendment in supplying medical needs." Adams, 61 F.3d at 1543. Dr. Figueroa's disagreement with Dr. Montoya's opinion about whether to "employ[] additional diagnostic techniques . . . is a classic example of a matter for medical judgment . . . [that] is not an appropriate basis . . . [to impose] liability [on Dr. Figueroa] under the Eighth Amendment." See id. at 1545 (internal quotation marks omitted).

Dr. Figueroa's and his nurses' first-hand observations led him to ignore the recommendations that Dr. Montoya made based on second-hand information. Dr. Montoya first proposed "a referral back to Gastroenterology" because Sims had "continued GI bleeding." But Dr. Figueroa decided a specialist was unnecessary because a gastroenterologist had already determined that hemorrhoids caused Sims's bleeding. And in the months

following, Sims required only "routine" treatment until a test revealed blood in Sims's stool, and Dr. Figueroa observed that Sims's hemorrhoids were inflamed. Relying on that examination, Dr. Figueroa discounted Dr. Montoya's second recommendation to refer Sims to a gastroenterologist to investigate "possible GI bleeding." Dr. Figueroa discounted Dr. Montoya's third recommendation, which was based on Sims's "GI bleed on colonoscopy" almost a year earlier, because Sims made "no complaint at [the] site of [his] rectal bleeding" to Dr. Figueroa or his staff. Later, Dr. Figueroa ignored Dr. Montoya's fourth recommendation for a referral based on a "[p]ossible GI bleed" as inconsistent with his finding that Sims's "stool [was] guaiac negative on examination." Dr. Figueroa's reasoned medical judgment that Sims did not require a gastroenterology consult, even if incorrect, did not amount to deliberate indifference to Sims's medical condition.

That Dr. Li later recommended banding Sims's hemorrhoids also did not evidence that Dr. Figueroa was deliberately indifferent to Sims's condition. Like Dr. Figueroa, Dr. Li attributed Sims's bleeding to his hemorrhoids. Dr. Li's ensuing recommendation to tie off the hemorrhoids to alleviate bleeding rather than to continue treatment with over-the counter remedies represented no more than a difference in medical judgment. *See Adams*, 61 F.3d at 1543. Because the obligation to provide medical care "doesn't necessarily demand curative care," *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1272 (11th Cir. 2020), Dr. Figueroa's judgment to continue conventional treatment was no

"more blameworthy than negligence," *Farmer*, 511 U.S. at 835, and did not amount to the type of incompetent or inadequate care that would violate the Eighth Amendment.

Sims argues that Dr. Figueroa was deliberately indifferent by delaying treatment, but this argument fails. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *overruled in part by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002). For a delay to constitute deliberate indifference, it must "seriously exacerbate the medical problem . . . [and be] medically unjustified." *Taylor v. Adams*, 221 F.3d 1254, 1260 (11th Cir. 2000) (citing *Hill*, 40 F.3d 1187–89). Sims submitted no evidence that he required more than nursing care until blood appeared in his stool or that waiting until December 2017 to obtain medicine made his hemorrhoids worse. The records that Sims had inflamed hemorrhoids before arriving at Suwanee, that the hemorrhoids later flared up and required treatment by Dr. Figueroa, and that Sims had "on/off bleeding" preceding his visit to Dr. Li belies Sims's argument that the delay in seeing a gastroenterologist worsened his medical condition. Sims failed to provide any evidence other than his speculation to establish that the delays in his treatment exacerbated the bleeding caused by his hemorrhoids.

Sims also argues that the district court construed the record in Dr. Figueroa's favor, but we disagree. The record supported

the finding of the district court "that medical staff, including Figueroa, . . . regularly saw [Sims] for" his rectal bleeding. Sims argues that the district court "erroneously inferred that his condition subsided under Dr. Figueroa's care," but Sims's medical records reflect that he required only "routine" treatment during the fall of 2017; that he little to no bleeding after Dr. Figueroa prescribed over-the counter medication in December 2017; and that, into the summer of 2018, he responded well to "routine" care.

Sims falsely accuses the district court of "disregard[ing]" his allegation that Dr. Figueroa was "trying to save money, not provide adequate medical care." The district court rejected Sims's "assert[ion] [that] cost-savings played a role in [his] treatment" because he "present[ed] no evidence that Figueroa was motivated by a desire to reduce costs." And, alternatively, the district court rejected Sims's argument as "unavailing." *See Hoffer*, 973 F.3d at 1273. As the district court stated, prison officials like Figueroa can consider the cost of treatment in making medical decisions when no material dispute exists about whether "the care provided . . . was not at least minimally adequate medical care."

The district court did not err by entering summary judgment in Dr. Figueroa's favor. Sims's medical records establish that Dr. Figueroa provided at least minimally adequate treatment for Sims's hemorrhoids. That Dr. Montoya and Dr. Li had different medical judgments did not establish that Dr. Figueroa was deliberately indifferent to Sims's medical condition.

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of Dr. Figueroa.